**REVISED JULY 16, 2001**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 99-50978
_____

SULZER CARBOMEDICS, INC.,

Plaintiff-Counter Defendant-Appellee-Cross-Appellant,

v.

OREGON CARDIO-DEVICES, INC.,
WALTER DOUGLAS CLARK,
NORTHWEST CARDO-DEVICES, INC.,

Defendants-Counter Claimants-Cross-Appellees,

SAINT JUDE MEDICAL, INC. and SAINT JUDE MEDICAL S.C., INC.,

Defendants-Appellants-Cross-Appellees.

_____

Appeals from the United States District Court
for the Western District of Texas, Austin Division
_____
July 10, 2001

Before KING, Chief Judge, WIENER, Circuit Judge, and LYNN[1], District Judge.

LYNN, District Judge:

Doug Clark is the sole shareholder of two corporations through which he has conducted a

business selling medical devices, Oregon Cardio-Devices, Inc. ("OCD") and Northwest Cardio-

Devices, Inc. ("NCD") (Doug Clark, OCD and NCD will be collectively referred to in this opinion

as "Clark" unless a distinction between them is necessary). In 1996, Clark entered into two

---

[1] District Judge of the Northern District of Texas, sitting by designation.

agreements with Sulzer Carbomedics ("Carbomedics") to sell Carbomedics's heart valves. One agreement covered Oregon and a small part of the state of Washington ("Oregon contract"), and the other covered other parts of the state of Washington ("Washington contract").[2] For a term of four years, those contracts gave Clark the exclusive right to sell Carbomedics's heart valves in the covered regions, and made Clark exclusive to Carbomedics, subject to termination provisions in the two contracts. That right of termination is "absolute," and provides that a "party availing itself of such right will not be liable to the other party for any loss, damage, indemnity, cost, expense, or thing of any kind or nature whatsoever, and any and all claims of such liability and the right to make such claims are . . . expressly waived." The contracts further provide: "In no event will either party be liable to the other for incidental, special or consequential damages, including but not limited to loss of anticipated revenues or profits or good will, for the [lawful][3] termination or cancellation of this Agreement for any reason whatsoever." The contracts also contain no-compete clauses. For one year after his relationship with Carbomedics ended, for any reason, the contracts prohibit Clark and his subrepresentatives from contacting former customers for "purposes of selling, offering for sale or promoting the sale" of any competing heart valves.

In the fall of 1997, Clark communicated with[4] St. Jude Medical, Inc. and St. Jude Medical S.C. (together, "St. Jude"), another seller of heart valves. Clark met with St. Jude's top

---

[2] The briefing of the parties variously refers to "contracts" and "contract," but apparently only the Oregon contract is at issue in this appeal.

[3] The word "lawful" is not in the Oregon contract.

[4] There is a lack of clarity about whether Clark approached St. Jude, or vice versa, in the fall of 1997. While Clark may have initiated the last contact with St. Jude before the contracts were executed, St. Jude had approached Clark at least twice previously.

executives to discuss his becoming a St. Jude sales representative. At the end of 1997, Clark entered into five agreements with St. Jude. Two of these contracts, both effective January 1, 1998, involved the sale of St. Jude's medical devices. One contract was for the sale of St. Jude's pacemakers in Oregon and the other was for the sale of St. Jude's heart valves in eight designated hospitals and medical centers in Oregon.[5] Under the heart valve contract, Clark was not eligible for commissions for two years. However, Clark and St. Jude entered into a separate agreement guaranteeing Clark a minimum commission of $815,000 annually for the first two years, under both of the St. Jude contracts. The latter agreement also provided that Jed Reay, a subrepresentative of Clark, would be entitled to a guaranteed minimum commission of $215,000 annually for the first two years. The parties also executed an indemnity agreement, under which St. Jude would indemnify Clark against third-party claims arising from his contractual relationship with St. Jude.

On December 31, 1997, after his contracts with St. Jude were in place, Clark sent a letter to Carbomedics, terminating his contracts with Carbomedics effective January 1, 1998. Ten months later, Carbomedics filed this lawsuit. In its Complaint, Carbomedics asserted claims against Clark for breach of contract and fiduciary duty for terminating the agreements early, for sharing confidential information, for engaging in activity that conflicts with Clark's faithful performance under the Carbomedics contracts, and for breaching the non-compete clauses, and claims against St. Jude for tortious interference with economic relations and unjust enrichment.

Defendants Clark and St. Jude moved for summary judgment, and Carbomedics moved for

---

[5] Carbomedics alleges that these eight hospitals and medical centers were all accounts Clark handled while at Carbomedics. It appears that St. Jude does not dispute this assertion.

partial summary judgment. The district court granted Clark's motion on the claim that he breached the contract by terminating early, holding that the plain language of the Oregon contract was unambiguous and clearly precluded any damages for early termination. The district court denied Clark's summary judgment motion on the non-compete, confidentiality, conflict of interest and breach of fiduciary duty claims. However, it stated that "there is no direct evidence that any breach by Clark caused any damages to Carbomedics whatsoever" and thus further cautioned that unless, at trial, Carbomedics presented more evidence of damages, it would grant a directed verdict for Clark. The district court also entered summary judgment for St. Jude on the unjust enrichment claim.

Following presentation of Carbomedics's case in chief, St. Jude and Clark filed Motions for Judgment as a Matter of Law under FED. R. CIV. P. 50. The district court carried the motion as to the tortious interference claim against St. Jude, but granted Defendants' motions on many other issues, finding no evidence that any violation by Clark of the conflict of interest, confidentiality, and non-compete clauses of his Carbomedics contracts or the alleged fiduciary duty violations caused any damages to Carbomedics. Thus, the court submitted to the jury only the tortious interference claim against St. Jude. On that claim, the jury returned a verdict for Carbomedics of $2 million in compensatory damages and $8 million in punitive damages.

After the jury rendered its verdict, the court considered St. Jude's Motion for Judgment as a Matter of Law and its Motion for Judgment Notwithstanding the Verdict or for New Trial. In ruling on these motions, the court remitted the jury's award to $923,743 in compensatory damages, and held that the evidence was insufficient to support the jury's punitive damages award.

-4-

Appellant St. Jude first asserts that the district court erroneously interpreted Oregon law when it denied St. Jude's Motion for Judgment as a Matter of Law on the tortious interference claim. The standard of review of the court's decision to deny judgment as a matter of law is *de novo*. *Stokes v. Emerson Elec. Co.*, 217 F.3d 353, 356 (5th Cir. 2000). Judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party on that issue." FED. R. CIV. P. 50(a).

There is no dispute that Oregon's "intentional interference with economic relations" law applies here. The elements of such a claim are: (1) the existence of a professional or business relationship, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relations, and (6) damages. *Uptown Heights Assocs. Ltd. P'ship v. SeaFirst Corp.*, 891 P.2d 639, 646 (Or. 1995) (en banc). In its post-trial Order, the district court stated that it had "struggled" with the fourth element of the above analysis, but nevertheless found that St. Jude's inducement of Clark to breach his ongoing contract with Carbomedics constituted an "improper means," such that the fourth element was satisfied. The district court found that the other elements were satisfied and thus denied St. Jude's Rule 50 motion on the tortious interference claim. St. Jude contends that the court erred in denying its motion on that issue, because inducement to breach the contracts, which the court found, does not satisfy the "improper means" requirement.

The improper motive or means requirement reflects the longstanding Oregon rule that to prove the tort of intentional interference with economic relations, the claimant must show that the

"interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 (Or. 1978) (en banc). The court in *Top Service* elaborated that these "improper motive or means" may be "wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Id*. It further described as examples of improper motive or means "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id*. n.11. In *Top Service*, Allstate discouraged claimants from taking their repair work to Top Service by disparaging Top Service's work and directing business from Top Service to repair shops on Allstate's preferred list. *Id.* at 1372. Top Service was formerly on the preferred list, but after a dispute with Allstate, the owner of Top Service decided not to be a drive-in shop for Allstate. The Oregon Supreme Court held that Allstate's behavior did not constitute improper motive because it was "wholly consistent with Allstate's pursuit of its own business purposes as it saw them . . . ." *Id*. However, the court noted that such behavior may have constituted improper means, but since that theory had not been presented to the jury, the court did not reach it. *Id.* at 1373.

St. Jude argues that the mere inducement to breach a contract cannot satisfy the improper motive or means test. Carbomedics responds that inducing the breach of a binding contract is wrongful conduct under Oregon law, and that the record contains ample evidence of such inducement by St. Jude.

In *Uptown Heights,* the defendant bank asserted that plaintiff's allegations that the bank refused to deal with a corporate third party, WRC, unless WRC broke off its relations with plaintiff, were legally insufficient to withstand the Bank's motion to dismiss. *Uptown Heights*,

-6-

891 P.2d at 647-49. In holding that the case was not subject to dismissal, the Oregon Supreme Court noted two scenarios described in the comment section of RESTATEMENT (SECOND) OF TORTS § 766. *Id*. at 648. In the first example, a defendant hears of a third party's contact with the plaintiff and thus refuses to deal with that third party. *Id*. When asked by the third party to explain its conduct, the defendant explains that its reason is the third party's contact with the plaintiff. *Id*. Thereafter, the third party cancels his contract with the plaintiff. In the second scenario, upon hearing of the third party's contact with the plaintiff, the defendant writes the third party, advising that: (1) it could not tolerate the third party's involvement with the plaintiff, (2) if the third party terminated its relationship with the plaintiff, the third party would be "more than compensated," and (3) if the third party does not advise the defendant within ten days that it has terminated its relationship with the plaintiff, the defendant will not do any further business with the third party. *Id*. In this example, after receiving the letter, the third party cancels its contract with plaintiff. *Id*. The court in *Uptown* concluded that the defendant would be liable in the second scenario, but not in the first. *Id*. The court found that the defendant's alleged promise to WRC that a loan to it would be forthcoming, if it broke off its relationship with plaintiff, went beyond a "mere silent refusal," and was more akin to the second example in the RESTATEMENT scenario than the first. *Id*. at 649. The court concluded that the plaintiff's complaint described a "form of affirmative inducement for WRC to remove Uptown from the joint venture," which satisfied the improper motive or means element. *Id*.

Here, the district court noted that St. Jude knew about Clark's contracts with Carbomedics and that St. Jude's lawyers drafted a lucrative contract with Clark that "explicitly required Clark to violate his covenants not to compete with Carbomedics." Based on the law as

articulated by the Oregon Supreme Court, we conclude that the district court properly held that such conduct was sufficient to satisfy the improper motive or means element.

St. Jude next contends that the district court erroneously interpreted the contractual limitation of liability provision when it denied St. Jude's summary judgment motion on the tortious interference claim. This court lacks jurisdiction to consider the denial of summary judgment. *Brown v. Slenker*, 220 F.3d 411, 421 n.9 (5th Cir. 2000). It can, however, review on a *de novo* basis the legal and factual issues raised by St. Jude's Rule 50 motion on this issue.[6]

The district court held that the plain language of the limitation of liability clause in Clark's contract with Carbomedics precluded Carbomedics's claims against Clark for early termination. The court also held, however, that the same clause did not protect St. Jude from liability for tortious interference. According to the district court, "a party who tortiously interferes is liable for the plaintiff's losses rather than its own profits, but does not receive the benefit of the plaintiff's limitation of liability."

St. Jude now argues that the limitation of liability clause precludes recovery against St. Jude, as any other interpretation "allows Carbomedics to recover from St. Jude on an intentional interference claim for inducing the very same breach for which it could not recover from Clark."

Carbomedics responds that (1) St. Jude cannot escape tort liability based on a contract provision to which it is not a party and, in any case, (2) the limitation of liability clause does not shield Clark from liability.

The Carbomedics contract contains a provision mandating that Texas law will govern all

---

[6] The parties agree that Texas law controls issues regarding the limitation of liability clause and the Court thus has assumed that to be the case.

the terms of the contract.  The provision at issue here states:

> Damages.  In no event will either party be liable to the other for incidental, special or consequential damages, including but not limited to loss of anticipated revenues or profits or good will, for the termination or cancellation of this Agreement for any reason whatsoever.

St. Jude relies heavily on *Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227 (5th Cir. 1986).  In *Marcus*, the Fifth Circuit addressed the question of whether the correct measure of damages for tortious interference under Texas law is the defendant's profit or the plaintiff's loss.  In holding that the plaintiff's loss was the proper measure of damages, the court noted that:

> It would be inconsistent to require the party inducing a breach to disgorge its excess profits while permitting the breaching party to retain its excess profits.  Given this apparent inconsistency as well as Texas case law indicating that the measure of damages for interference with contractual relations is identical to that for breach of contract, the district court properly limited [the plaintiff's] actual damages award to [the plaintiff's] loss suffered as a result of the interference.

*Id*. at 232.  *See also W. Oil & Fuel Co. v. Kemp*, 245 F.2d 633 (8th Cir. 1957).

Since the court found no damages were proved as to Clark, and the limitation of liability clause was applicable to Clark in any case, *Marcus* seems to compel a result favorable to St. Jude.  However, the district court correctly noted that the contract in *Marcus* did not contain a limitation of liability clause like the one in this case.  Because of its existence, the damages against Clark and St. Jude would be different unless the non-contracting party, St. Jude, gets the benefit of the limitation.  To allow St. Jude to enforce the limitation would undermine the "aim of awarding damages for tortious interference," which is "to place the injured party in the same economic position it would have been in had the contract not been breached."  *Marcus*, 797 F.2d

at 231.  The district court correctly noted that post-*Marcus* Texas

law holds that although such damages are not recoverable for breach of contract,[7] a party found

liable for tortious interference with a contract may be liable for, among other things, "emotional

distress or actual harm to reputation, if [those injuries] are reasonably to be expected to result

from the interference." *Exxon Corp. v Allsup*, 808 S.W.2d 648, 660 (Tex. App.–Corpus Christi

1991, writ denied) (citing *King v. Acker*, 725 S.W.2d 750, 754 (Tex. App.–Houston [1st Dist.]

1987, no writ) and RESTATEMENT (SECOND) OF TORTS § 774A (1977).  *But see Hallmark v.*

*Hand*, 885 S.W.2d 471, 481 (Tex. App.–El Paso 1994, writ denied).  Thus, the measure of

damages for breach of contract and tortious interference with a contract are not necessarily the

same.  In fact, as the court in *Allsup* stated, "a claim for interference with contract is one in tort

and . . . damages are not based on contract rules; therefore, it is not required that the loss incurred

be one within the contemplation of the parties to the contract itself at the time the contract was

made." *Allsup*, 808 S.W.2d at 660 (citing RESTATEMENT (SECOND) OF TORTS 774A cmt. (d)

(1977)).[8]  *See also Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666

(Tex. 1990) (that contract was terminated in compliance with notice provision was no defense to

tortious interference with contract's performance).  The district court therefore did not err in

determining that the limitation of liability provision in Carbomedics's contract with Clark did not

---

[7] *See Rubalcaba v. Pacific/Atlantic Crop Exch., Inc.*, 952 S.W.2d 552, 559 (Tex. App.–El Paso 1997, no writ) (as to business reputation); *Hallmark v. Hand*, 885 S.W.2d 471, 481 (Tex. App.–El Paso 1994, writ denied) (as to mental anguish).

[8] We note that Oregon has adopted § 774A(1) of the RESTATEMENT (SECOND) OF TORTS which allows, among other things, the recovery of punitive damages for tortious interference with economic relations. *Mooney v. Johnson Cattle Co.*, 634 P.2d 1333, 1335 n.5, 1338 n.10 (Or. 1981).  The Texas case of *Allsup* cites to the same RESTATEMENT section.

preclude St. Jude's liability for tortious interference.

Carbomedics also contests the district court's interpretation of the limitation of liability provision in its order granting summary judgment for Clark. This Court reviews such order *de novo*. *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 333 (5th Cir. 1997). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). A material fact is one that "might affect the outcome of the suit under the governing law" and a "dispute about a material fact is 'genuine'. . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The record before the court must be considered in the light most favorable to the nonmovant. *Harrison v. Byrd*, 765 F.2d 501, 504 (5th Cir. 1985).

Carbomedics asserts that the district court read the limitation of liability provision in isolation, thus "flouting" the rules of contract construction. Carbomedics argues that "even though the parties painstakingly set out how and when the Agreements could be terminated, the Defendants contend the parties intended to waive any and all damages, whether or not the termination provisions were followed." Carbomedics asserts that the district court's erroneous interpretation of the limitation of liability clause renders meaningless the termination provisions. Clark urges that the plain language of the limitation of liability clause could not be any clearer, and that it precludes damages against Clark for early termination.

"In determining whether the language of the contract is unambiguous . . . [courts] 'should examine and consider *the entire writing* in an effort to harmonize and give effect to *all provisions*

-11-

of the contract so that none will be rendered meaningless.'" *Clardy Mfg. Co. v. Marine Midland Bus. Loans*, 88 F.3d 347, 352 (5th Cir. 1996), *cert. denied*, 519 U.S. 1078 (1997) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis added). Here, the provision at issue seems clear enough; and, contrary to Carbomedics's position, it does not render meaningless the section of the contract setting out the specific grounds for termination. As Clark points out, "[w]hile the contract is still in effect, it confers various rights on the parties. Even after the agreement is terminated, the clause does not bar claims for moneys [sic] owed prior to termination, and it does not bar the possibility of injunctive relief." Because the contract is unambiguous, its language must be enforced as written, looking at the objective intent as manifested by the language used, rather than interpreting it by attempting to divine the subjective intent of the parties. *Id.* (citing *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). As the trial court noted, the language of the contract clearly states that "in no event" shall a party be liable for incidental, special, or consequential termination damages "for any reason whatsoever." Thus, the district court did not erroneously interpret the contract when it determined that Clark could not be liable for damages for early termination.

After Carbomedics put on its case-in-chief, the district court granted Clark's Motion for Directed Verdict on the remaining claims against him. The court reasoned that because of the limitation of liability clause, Clark was not responsible for damages for termination breaches. In apparently concluding that the limitation of liability clause did not apply to the other claims, the court further ruled, as a matter of law, that there was no evidence that Clark's violation of the conflict of interest, confidentiality, or non-compete clauses of its contracts with Carbomedics caused any damages to Carbomedics.

By cross appeal, Carbomedics asserts that the limitation of liability provision does not preclude recovery for breaches other than those relating to early termination. Since the district court's rulings are not to the contrary, and Carbomedics does not point to any evidence that would undermine the district court's ruling on the merits of those claims, its appellate point is without merit.

On the issue of compensatory damages, St. Jude asserts that the district court erred in finding sufficient evidence to support compensatory damages of $923,743. St. Jude attacks the compensatory damage award on two grounds: (1) the absence of proof of causation for Carbomedics's drop in sales (i.e., lost profits), and (2) Carbomedics's failure to prove, to a reasonable degree of certainty, any lost profits. On causation, St. Jude asserts that "the only claim submitted to the jury was the claim for inducing termination–not for damages caused by any supposedly wrongful conduct that occurred after the termination." It then argues that Carbomedics offered no evidence linking Clark's departure from Carbomedics to the decline in Carbomedics's sales, and that St. Jude offered proof that factors other than Clark's departure directly caused the drop in Oregon sales, such as the expiration of a major hospital contract, changes in the medical practices in which Carbomedics's products had been used, doctors who stopped practicing or moved out of state, St. Jude's new competitive product, and higher mortality/morbidity rate for patients using Carbomedics's heart valves. Carbomedics asserts that it introduced sufficient evidence to support the jury's verdict on causation.

Carbomedics can only recover damages for lost profits if it can prove those damages with "reasonable certainty." *Willamette Quarries, Inc., v. Wodtli*, 781 P.2d 1196, 1200 (Or. 1989) (en banc) (citing *Buck v. Mueller*, 351 P.2d 61 (1960)); *see also Great Pines Water Co. v. Liqui-Box*

*Corp.*, 203 F.3d 920, 922 (5ᵗʰ Cir. 2000). Reasonable certainty means "probability." *Welch v.*

*U.S. Bancorp Realty and Mortgage Trust*, 596 P.2d 947, 963-64 (Or. 1979) (citing *Cont'l Plants*

*Corp. v. Measured Mktg. Serv., Inc.*, 547 P.2d 1368, 1370 (Or. 1976) (en banc)). To meet this

test, Carbomedics must have adduced  evidence that its heart valve sales were "hampered or lost"

because of St. Jude's tortious interference with Carbomedics's contract with Clark. *Willamette*,

781 P.2d at 1200. In other words, the record must support the conclusion that, but for the

alleged interference, more hospitals/doctors would have bought Carbomedics's heart valves. *Id*.

*See generally Cont'l Plants Corp. v. Measured Mktg. Serv.*, 547 P.2d 1368, 1370-71 (Or. 1976).

However, Carbomedics need not have introduced specific evidence from actual or potential

customers that they would have bought Carbomedics's heart valve if Clark had been selling it.

*Cont'l Plants*, 547 P.2d at 1370. Oregon jurisprudence "does not require such exactitude of

proof." *Id.*

Carbomedics points to the following evidence of causation:  (1)  testimony that in the

heart valve industry, the loss of a valued salesman like Clark could be "very harmful," or cause

"substantial damage;" (2) testimony that after Clark's departure he immediately began calling on

his former Carbomedics customers, accompanied by the St. Jude heart valve representative; (3)

testimony that Clark had bragged that he had "broken the barriers of resistance with surgeons to

using the St. Jude valve," and that in "three months" Carbomedics's sales would "dry out;" (4)

Carbomedics's sales in Oregon dropped by 40% in 1998–while at the same time its national sales

were up 5% and its sales in the western United States were up 25.6%; (5) during the same time,

St. Jude's mechanical valve sales in the Oregon region rose 33%; (6) Carbomedics's

contemporaneous internal sales reports identified the loss of Clark and his "unlawful competition"

-14-

as major contributors to Carbomedics's drop in sales; and (7) the accounts set out in Clark's heart valve contract with St. Jude were all accounts he serviced while under contract with Carbomedics.

The evidence in this case is more like that in *Continental Plants*, in which the Oregon Supreme Court found the evidence sufficient to sustain the jury's determination of causation, than like that in *Willamette*, in which the Oregon Supreme Court found the evidence insufficient to establish causation. The plaintiff in *Continental Plants* was an auctioneer of industrial machinery who contracted with the defendant to mail brochures advertising the sale of newly acquired machinery. *Id.* However, through the defendant's error, many of the brochures were mailed to wood fabricators instead of the intended recipients, metal fabricators. To prove that the auction was unsuccessful because of the defendant's error,

> [p]laintiff introduced evidence that the number of persons who registered for its sales were in a fairly constant proportion to the number of brochures which were mailed, and that the number of persons who purchased at its auctions were in constant proportion to the number who registered for the sale. It then showed that the proportion of registrants to the number of brochures mailed for the sale in question was enormously reduced as compared with 13 prior and subsequent sales it conducted over a period of 18 months. Plaintiff also introduced evidence that the average return from the 13 other sales was 157.5 per cent of the machinery's cost, while the return from the sale in question was only 29 per cent of plaintiff's cost, and that the present sale was the only one in which it had suffered a loss.

*Id.* at 1371. The Oregon Supreme Court in *Continental Plants* found such evidence sufficient to prove causation, in contrast to the evidence in *Willamette*. There, the plaintiff contracted with one of the defendants to establish a rock quarry on that defendant's land and to have the exclusive right to remove rock from the premises. *Willamette,* 781 P.2d at 1198. However, that defendant

-15-

entered into an agreement with an "interfering" party (another defendant in the case), allowing it to remove rock from the same premises. The "interfering" party extracted rock from plaintiff's quarry and sold it to yet another defendant. In an effort to prove damages by loss of profits, plaintiff introduced evidence that the "interfering" party "removed over 100,000 yards of riprap rock . . . and that the market price for such rock was between $1.80 and $2.00 per yard." *Id.* at 1200. The Oregon Supreme Court held that such evidence did not support the conclusion that sales were lost because of the third party's conduct.

In the instant case, there is at least some evidence that Clark's departure caused Carbomedics to incur lost profits. Most significant is the evidence that Carbomedics's sales dropped 40% in 1998 in the Oregon area while Carbomedics's sales grew nationwide. While more "local" factors also may have contributed to Carbomedics's sales drop in the Oregon area, the jury could reasonably have believed that the loss of Clark, a very effective salesman, also contributed to Carbomedics's drop in sales.

On the issue of the amount of damages, Carbomedics relied heavily on the testimony of Jane Harvey, its Chief Financial Officer. She reviewed heart valve sales in the three years before Clark's departure and determined that Carbomedics's annual profits in Oregon had grown (1) 110% from 1994 to 1995, (2) 83.4% in 1996 and (3) 29.7% in 1997. Assuming Clark would, "as he had in the past, maintain normal historical levels of sales and growth despite competitive pressures that existed both before and after he left," Ms. Harvey estimated that sales in the Oregon territory would grow 25.6% in 1998, sales being up 25.6% in the western United States, and used this growth rate to estimate profits for two years following the end of Clark's contract with Carbomedics, plus one year representing the non-compete period, for total lost profits of

-16-

$2,500,000. The district court concluded that this evidence did not support the jury award of $2 million, because it did not adequately address the numerous other factors that probably impacted Carbomedics's sales in 1998 and 1999. The trial court stated that the evidence did not support "any finding that Carbomedics's sales would have increased in 1998 and 1999 even if Clark had not left," and that "the most generous jury that would be reasonable would be one finding that Clark could have kept Carbomedics's sales up to the 1997 levels despite the numerous problems in the Oregon region." St. Jude now argues that the court's damage award, based on the likelihood of sales in 1998 meeting sales in 1997, was just as speculative as was the jury's award, in light of all of the factors that Clark could not control (i.e., a major surgeon cut back on his surgeries due to a personal tragedy; another surgeon moved out of the area; a major hospital opted to contract with St. Jude because it significantly reduced its heart valve prices to match Carbomedics's; doctors and hospitals agreed to participate in a study sponsored by St. Jude; some doctors decided to use tissue valves instead of mechanical valves; and Carbomedics's valves were possibly causing thrombosis).

While the district court may not determine damages by "'speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *DSC Communications Corp. v. Next Level Communications*, 107 F.3d 322, 330 (5th Cir. 1997) (citing *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 24 (5th Cir.), *cert. dismissed,* 419 U.S. 987 (1974) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). As Carbomedics points out in its briefing, the district court more than halved the jury's compensatory damages award, which was already $500,000 less than Ms. Harvey's estimate. The district court did not

base its decision on "speculation or guess." Instead, it based its compensatory damage award on the actual sales in the year before Clark left. It then took St. Jude's claim of conflicting causes of damages into account, by basing the compensatory damages on heart valve sales the year before, instead of assuming, as Carbomedics's expert did, that sales would have continued to increase despite all the negative factors noted by St. Jude. The district court also factored into its figure the commissions Carbomedics would have saved. Because the district court's judgment of $923,743 in compensatory damages was a "matter of just and reasonable inference," we conclude that the district court did not err in awarding damages in that amount.

Carbomedics accepted a remittitur of the jury's $2 million award in compensatory damages to $923,743. As for the jury's award of $8 million in punitive damages, the district court found, as a matter of law, that there was insufficient evidence to support a punitive damages award. Alternatively, the district court determined that a jury award of more than $1,847,486 for punitive damages would be excessive. Carbomedics now appeals the district court's rejection of the jury's punitive damages determination. St. Jude contends that Carbomedics cannot appeal the punitive damages award, since it accepted a remittitur of its compensatory damages award, and thus waived its right to appeal the district court's decision to overturn the jury's award of punitive damages. The court agrees that in light of the remittitur, Carbomedics cannot appeal the court's decision not to award punitive damages.

The Supreme Court, in *Donovan v. Penn Shipping Co.*, reaffirmed the "longstanding" rule that "a plaintiff cannot appeal the propriety of a remittitur order to which he has agreed." 429 U.S. 648, 694-50 (1977). This court has recognized an exception to this rule, acknowledged in *Lanier v. Sallas*, that "the acceptance of a remittitur on one count of a complaint does not bar an

-18-

appeal from an adverse judgment with respect to *an entirely separate and distinct cause of action.*" 777 F.2d 321, 325 (5th Cir. 1985) (emphasis added). However, in *Lanier*, this court held that "[a] cause of action for punitive damages is not . . . separate and distinct from the underlying claim for compensatory damages." *Id*. Under *Lanier*, Carbomedics should not be allowed to appeal the district court's order overturning the punitive damages award after it accepted the remittitur on the compensatory damages award.

This conclusion is buttressed by the reasoning of other courts of appeals that have reached this issue. *See Anderson v. Roberson*, 249 F.3d 539, 543 (6th Cir. 2001) (citing *Lanier* and stating: "While we have not yet spoken on the question of whether the compensatory and punitive aspects of an award of damages are severable for purposes of appeal, other circuits to consider the question have concluded that they are not severable. We agree with our sister circuits on this point. Clearly, any award of punitive damages is dependent on the liability verdict, which, if the remittitur of the compensatory damages is not accepted, will be vacated and the issue retried." (internal citations omitted)); *Utah Foam Prods. Co. v. The Upjohn Co.*, 154 F.3d 1212, 1216 (10th Cir. 1998) (relying upon *Lanier* and holding that "acceptance of remittitur of either compensatory or punitive damages bars appeal of issues related to both"), *cert. denied*, 526 U.S. 1051 (1999).

*Lanier* states quite clearly that only separate and distinct *causes of action* are appealable and that an award of punitive damages is not a separate cause of action. *See Lanier*, 777 F.2d at 325. Instead, it remains "dependent on the liability verdict" from which the award of

compensatory damages arises. *See Anderson*, - - - F.3d - - -, 2001 WL 468485, at *4.[9]

Therefore, when Carbomedics accepted the district court's remittitur of compensatory damages, it waived its right to appeal the district court's decision to overturn the jury's award of punitive damages. We therefore do not reach the issue of what punitive damages would have been justified in light of the defendant's wrongful conduct, an issue on which we would now be obligated to conduct a *de novo* review under *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 121 S. Ct. 1678 (May 14, 2001).

Based upon the foregoing, we AFFIRM the district court on all grounds, with costs taxed to the party incurring same.

---

[9] This interpretation is further supported by those decisions considering the finality of judgments for purposes of appealability under Federal Rule of Civil Procedure 54(b). *See Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743 n.4 (1976) (evaluating finality of judgment under Rule 54(b) and stating that "a complaint asserting only one legal right, even if seeking multiple remedies for the alleged violation of that right, states a single claim for relief"); *Ariz. State Carpenters Pension Trust Fund v. Miller*, 938 F.2d 1038, 1040 (9th Cir. 1991) (discussing Rule 54(b) and holding that "it is clear that the count for punitive damages is not `separate and distinct' from the remainder of the counts in the complaint, but is based on a single set of facts giving rise to a legal right of recovery under several different remedies"); *Sussex Drug Prods. v. Kanasco, Ltd.*, 920 F.2d 1150, 1155 (3d Cir. 1990) ("When liability rests on the same transaction or series of transactions, a count for punitive damages, although of a different order than compensatory damages, does not constitute a separate claim under Rule 54(b).").