**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

**No. 06-2097**

————————

SENSORMATIC SECURITY CORPORATION,

Plaintiff - Appellant,

versus

SENSORMATIC ELECTRONICS CORPORATION; ADT
SECURITY SYSTEMS, INCORPORATED,

Defendants - Appellees.

————————

**No. 06-2099**

————————

SENSORMATIC SECURITY CORPORATION,

Plaintiff - Appellant,

versus

SENSORMATIC ELECTRONICS CORPORATION,

Defendant - Appellee.

————————

**No. 06-2124**

————————

SENSORMATIC SECURITY CORPORATION,

Plaintiff - Appellee,

versus

SENSORMATIC ELECTRONICS CORPORATION; ADT
SECURITY SYSTEMS, INCORPORATED,

Defendants - Appellants.

_____

Appeals from the United States District Court for the District of
Maryland, at Greenbelt. Deborah K. Chasanow, District Judge.
(8:04-cv-00174-DKC; 8:05-cv-03473-DKC)

_____

Argued: November 1, 2007          Decided: March 31, 2008

_____

Before WILKINSON and SHEDD, Circuit Judges, and Claude M. HILTON,
Senior United States District Judge for the Eastern District of
Virginia, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by unpublished per
curiam opinion.

_____

**ARGUED:** Robert V. Zener, BINGHAM & MCCUTCHEN, L.L.P., Washington,
D.C., for Sensormatic Security Corporation. Edward C. Barnidge,
III, WILLIAMS & CONNOLLY, L.L.P., Washington, D.C., for Sensormatic
Electronics Corporation and ADT Security Systems, Incorporated. **ON
BRIEF:** David J. Butler, Jason R. Scherr, BINGHAM & MCCUTCHEN,
L.L.P., Washington, D.C., for Sensormatic Security Corporation.
Bruce R. Genderson, George A. Borden, Katherine G. Lindsey,
WILLIAMS & CONNOLLY, L.L.P., Washington, D.C., for Sensormatic
Electronics Corporation and ADT Security Systems, Incorporated.

_____

Unpublished opinions are not binding precedent in this circuit.

2

PER CURIAM:

Franchisee Sensormatic Security Corporation ("SSC") brought these actions against its franchisor, Sensormatic Electronics Corporation ("Sensormatic"), and ADT Security Systems ("ADT") for breach of contract.  There are three issues before this Court on appeal.  First, SSC seeks entitlement to certain contract terms and commission rates contained in Sensormatic's agreement with another franchisee pursuant to a More Favorable Contracts clause in the SSC-Sensormatic Franchise Agreement.  Next SSC argues that Sensormatic and ADT breached the Franchise Agreement by failing to sell certain products through the procedures established by the Franchise Agreement.  Finally, in a counterclaim Sensormatic seeks declaration that certain language in the Agreement grants Sensormatic the right to terminate the Franchise Agreement without cause and pay only damages specified by the contract. The district court  held on summary judgment that certain products were outside the purview of the Franchise Agreement. The district court dismissed two of SSC's claims under the rule against claim splitting.  The district court granted summary judgment to SSC on Sensormatic's counterclaim.  We affirm in part and reverse in part.


I.

Sensormatic pioneered the development of anti-theft devices in the 1960s and continues to develop and sell related products today.

3

In the 1960s and 1970s, Sensormatic's primary product was the "Sensormatic System," which it sold to retail customers through a franchise arrangement, with franchisees servicing various territories in the United States. In recent years, Sensormatic chose to move away from the franchise model and has now bought out all but two of its franchisees.

SSC has been the Sensormatic franchisee for the Maryland/Washington, D.C./Virginia territory since 1967. The present disputes arise under a 1976 Amended Franchise Agreement between SSC and Sensormatic. The Agreement grants SSC an exclusive right to sell and/or distribute within the franchise territory "Detection Devices, Tags, Accessories and Supplies for Automatic Theft Detection Uses." "Detection Devices" and "Automatic Theft Detection Uses" are defined in the contract.

A "More Favorable Contracts" ("MFC") clause provides SSC with an option to amend the Agreement if Sensormatic "enters into any contract" with another similarly situated franchisee that contains more favorable terms and conditions.

The Agreement is not limited to a specific term, but permits Sensormatic to terminate for various causes, such as SSC's insolvency. However, Section 12.H of the Agreement states that "[t]he termination of this Agreement for any reason whatsoever shall not terminate the obligations of the parties" and establishes specific payments, which "are deemed to be full satisfaction . . .

4

of any claim . . . which the Franchisee may have or assert arising from the termination of this agreement."

In 1984, SSC and Sensormatic amended the Agreement to settle a dispute over whether the Agreement covers certain closed-circuit television ("CCTV") products. This Settlement provides that certain CCTV products are included in the franchise and that SSC receive a commission rate of forty percent of the gross profits on the sale of those products in the SSC territory. The 1976 Agreement establishes a commission rate of fifty percent of gross revenue on sales of all other Sensormatic products covered by the Agreement and sold in the SSC territory.

In 1978, Sensormatic entered into a Franchise Agreement with Winner & Bagnara, Inc. ("Winner") to cover the Pennsylvania/Delaware territory. Winner's Agreement is materially identical to SSC's 1976 Agreement, except that Winner's contains an addendum that broadens Winner's franchise to include "access-control" products. Access-control products are designed and marketed to control whether an individual has access to enter a building or a room within a building. At the same time Winner and Sensormatic executed their Franchise Agreement, Sensormatic leased from Winner the exclusive right to operate in the Winner franchise territory for twenty years. At the end of the twenty year lease, Sensormatic had the option to buy out Winner's rights entirely as the duration of Winner's franchise, like SSC's, was not limited to

5

a specific term. In 1998, Sensormatic attempted to buy out Winner's rights and a legal dispute ensued (the Winner litigation). In United States District Court for the Western District of Pennsylvania, Winner argued that Sensormatic's attempted buyout constituted breach of contract. The Winner court held that Sensormatic forfeited its right to buy out the Winner franchise and the Court of Appeals for the Third Circuit affirmed. Sensormatic Electronics Corp. v. First Nat'l Bank Pa., 148 Fed. App'x. 99 (3rd Cir. 2005)(unpublished).

To properly calculate damages, the Winner court considered whether the sale of certain, more recently developed Sensormatic products was covered by the Winner Agreement and subject to the Agreement's commission rate. The Winner court held that CCTV, radio frequency identification device ("RFID"), and various other more newly-developed products were covered by the Winner Agreement. This ruling subjects the sale of CCTV products in the Winner territory to the fifty percent of gross sales commission rate stated in the Franchise Agreement rather than the forty percent of gross profits rate agreed-upon by SSC and Sensormatic in their 1984 Settlement.

In 2002, SSC brought suit in United States District Court for the District of Maryland against Sensormatic to challenge Sensormatic's distribution of newly-developed CCTV products in the SSC franchise territory and its failure to pay commission to SSC on

those sales (Sensormatic I). Sensormatic I is currently pending at the district court and is not on appeal. Over one year after filing its complaint in Sensormatic I but prior to the deadline for filing an amended complaint, SSC learned of the addendum Sensormatic signed with Winner including access-control products in the Winner franchise. By the time SSC decided to assert a claim based on the Winner addendum, the deadline for filing an amended complaint had passed. SSC sought leave to file an amended complaint and the court denied SSC's motion on the ground that SSC "did not diligently address the need for an amendment of the scheduling order when it first learned of the Winner Addendum, before the scheduling order deadline passed."

The day after its motion for leave was denied, SSC filed a separate action in the same court asserting the identical MFC claim it sought to add to Sensormatic I (Sensormatic II). SSC later amended the Sensormatic II complaint to include claims that Sensormatic breached the Franchise Agreement by failing to sell RFID products in the SSC territory in accordance with the Franchise Agreement. Sensormatic moved to dismiss both the access-control claims and the RFID claims on the ground that the second suit violates the rule against claim splitting. The district court granted this motion with respect to the access-control claims, but denied it with respect to the RFID claims. The district court later granted Sensormatic's motion for summary judgment on the RFID

claims, holding that RFID products are not covered by the Franchise Agreement.

In Sensormatic II, Sensormatic filed a counterclaim seeking declaration from the court that Section 12.H of the Franchise Agreement establishing SSC's damages in the event of termination "for any reason whatsoever" constitutes a liquidated damages provision and grants Sensormatic the right to terminate the Franchise Agreement and pay only the damages stated in that Section. The district court granted SSC's motion for summary judgment, holding that Section 12.H did not give Sensormatic the right to terminate the Franchise Agreement and pay only liquidated damages. The district court's decisions to dismiss SSC's access-control claims, grant Sensormatic's summary judgment motion on SSC's RFID claims, and grant SSC's summary judgment motion on Sensormatic's counterclaim are all currently before this Court on appeal.

After the Third Circuit affirmed the district court's decision in Winner — holding that the Winner Agreement covered certain CCTV products — SSC filed a third lawsuit seeking a more favorable commission rate for the sale of CCTV products (Sensormatic III).* SSC argued that the MFC clause requires Sensormatic to give SSC the more favorable forty percent of gross sales commission rate for the sale of CCTV products rather than the fifty percent of gross-

---

*ADT is not a party in Sensormatic III.

8

profits rate established by the 1984 Settlement. As <u>Sensormatic III</u> was filed forty-two months after SSC filed <u>Sensormatic I</u> and involves the same products at issue in that case, the district court granted Sensormatic's motion to dismiss on the ground that the claims in <u>Sensormatic III</u> violate the rule against claim splitting. SSC's appeal of this decision is also currently before this Court.

## II.

This Court reviews <u>de</u> <u>novo</u> the district court's grant of Sensormatic's motion for summary judgment on SSC's RFID claims. <u>See</u> <u>Nat'l City Bank of Ind. v. Turnbaugh</u>, 463 F.3d 325, 329 (4th Cir. 2006)("We review a grant of summary judgment <u>de</u> <u>novo</u>"). SSC argued below that collateral estoppel ought to apply to the <u>Winner</u> court's decision that the Winner Agreement covers RFID products. Review of a district court's decision on collateral estoppel is also <u>de</u> <u>novo</u>. <u>See</u> <u>id.</u> We consider SSC's collateral estoppel argument first.

## A.

When federal jurisdiction in a prior case is based on diversity of citizenship, for any subsequent suit in federal court, federal law incorporates the preclusion law of the state in which the court that rendered judgment in the prior suit sits. <u>Semtek</u>

9

Intern. Inc. v. Lockheed Martin Corp., 531 U.S. 497 (2001). As Winner was a diversity case in Pennsylvania, this Court applies the collateral estoppel law of Pennsylvania.

Collateral estoppel prevents "the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate." Ramsay v. I.N.S., 14 F.3d 206, 210 (4th Cir. 1994). The Winner court held that the Winner franchise included all Sensormatic product lines that are used for the prevention and detection of shoplifting and other theft and concluded that RFID products are within the scope of that definition.

The district court declined to apply collateral estoppel to the RFID-coverage issue because that issue "was not actually litigated in the Pennsylvania case because Sensormatic did not contest that RFID products were an Automatic Theft Detection Product." See Uzdaviness v. Weeks Marine, Inc., 418 F.3d 138, 146 (2d Cir. 2005)(stating that "[m]ost courts have held that a fact established in prior litigation by stipulation, rather than by judicial resolution, has not been actually litigated"). Stipulation is evidenced by the Winner court's quotation from a Sensormatic brief stating that newly-developed Sensormatic products "are not 'successors' to the Sensormatic System. These products do

not use microwave technology and have not been marketed as replacements to the microwave-based Sensormatic System. Additionally, <u>with the exception of the other electronic article surveillance systems and RFID, none of them are even products for Automatic Theft Detection</u>."  (emphasis added).

SSC argues that the district court erred because the issue of franchise coverage of RFID products is comprised of two more narrow issues: whether RFID products are used for Automatic Theft Detection under the Agreement and whether RFID products are successor products to the Sensormatic System that existed in 1970s. SSC argues that in <u>Winner</u>, Sensormatic chose to stipulate that RFID products were used for Automatic Theft Detection and contested the coverage issue on the ground that RFID products are not "successors to" the 1970s Sensormatic System.  SSC argues that "[a] finding that rests in part on a stipulation and in part on litigation, however, supports preclusion."  18A Wright, Miller and Cooper, Federal Practice and Procedure § 4443.

SSC's argument is unpersuasive because the rule giving preclusive effect to issues established by stipulation in prior litigation has only a narrow exception.  In recognizing the exception for findings that rest partially on stipulation and partially on litigation, the Seventh Circuit commented that:

> [t]he decisive reason for giving [stipulations] collateral estoppel effect is that a lawyer's recognition that the evidence is so stacked against him on some point that a failure to admit it will open him to sanctions

11

> under Fed. R. Civ. P. 37(c) is as good an indication of
> where the truth probably lies as a determination by a
> judge or jury.

Kairys v. I.N.S., 981 F.2d 937, 941 (7th Cir. 1992)(holding the rule against collateral estoppel of stipulated issues did not apply where the party against whom estoppel was sought stipulated that Nazi Germany invaded the Soviet Union on June 22, 1941). Indeed, the court in Kairys distinguished the case where a prior judgment rested solely on an admission — preclusion does not apply — from the case where "the party later sought to be estopped had put up a fight, conceding only the points hopelessly against him." Id. While we can only speculate as to why Sensormatic conceded in Winner that RFID products were used for Automatic Theft Detection, it is clear that this issue is not a mere background fact like whether Nazi Germany invaded the Soviet Union on a particular date. There is no indication that Sensormatic conceded the "Automatic Theft Detection Uses" issue because the point was "hopelessly against" it.

An issue for collateral estoppel purposes is "a single certain and material point arising out of the allegations and contentions of the parties." 18 Moore's Federal Practice § 132.02. Whether RFID products are used for Automatic Theft Detection is such an issue and the district court correctly ruled that its prior stipulation not be given collateral estoppel effect.

We now turn to whether the district court properly granted summary judgment to Sensormatic, holding that RFID products are not covered by the Franchise Agreement.

B.

Summary judgment is appropriate where there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56 (c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. See id. Mere speculation by the non-moving party "cannot create a genuine issue of material fact." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985); see also Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When a motion for summary judgment is

13

made, the evidence presented must always be taken in the light most favorable to the non-moving party. See Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (en banc).

RFID technology is used to identify and track products along the distribution chain. A RFID tag houses a chip that communicates product information to a "reader," which feeds the information to a computer database. The current primary use of RFID technology is to track pallets of a particular good — laundry detergent, for example — so that a particular quantity of that good can be more easily sent to the retail location that needs it most. For example, RFID enables Wal-Mart to know that its Manassas, Virginia location is running low on laundry detergent and to divert to Manassas a shipment currently en route to another store. SSC argues that, despite its current primary use, RFID technology can be used to prevent theft. Because RFID can be used to track pallets of a particular good, it stands to reason that RFID could be used to signal when a pallet has gone missing.

By contrast, the Sensormatic System is a microwave-emitting "electronic article surveillance" device. The System typically sits at a retail store's exit and is designed to detect tags attached to merchandise that are not removed, as is typically done after an item has been purchased. When the System detects a tag, an alarm or other control device is activated, automatically signaling a potential theft.

Section 2 of the Franchise Agreement gives SSC the right to sell/lease within the franchise territory "Detection Devices, Tags, Accessories and Supplies for Automatic Theft Detection Uses." "Detection Devices" are defined by the Agreement as:

> the detection systems and devices presently being marketed by the Franchisor for Automatic Theft Detection Uses . . . which include a transmitter and coordinated receiver and alarm console, and which may be installed and used as a system or device to detect Tags, sounding an alarm, or otherwise activating a control device, and all successors thereto.

"Automatic Theft Detection Uses" are defined in pertinent part as "uses for the prevention of shoplifting and other theft," which includes "the control and surveillance of inventory and merchandise offered for resale by retailers, wholesalers, manufacturers, government agencies, and others." To be covered by the Agreement, RFID products must be used for "Automatic Theft Detection" and must also satisfy the Agreement's definition of "Detection Devices."

We first consider whether RFID products are used for "Automatic Theft Detection." Sensormatic argues that summary judgment is appropriate because there is no evidence in the record showing that a single Sensormatic customer uses RFID products for theft detection. Indeed, the record contains testimony from various industry participants, including SSC's President, stating that Sensormatic RFID products are not currently being used or sold for theft detection, but rather are used to more efficiently distribute inventory among retail locations. Whether RFID <u>could</u> be

15

used for theft detection is not relevant to whether the Franchise Agreement covers these products as the Agreement only covers Sensormatic products sold for theft detection.

Certain Sensormatic/ADT marketing materials indicate that, at one time, Sensormatic and ADT considered theft detection to be a potential use for RFID products. However, a Sensormatic product is not covered by the Franchise Agreement simply because it was, at some point in time, marketed for theft detection. The Agreement covers "Detection Devices" "presently being marketed for" theft detection. As the Agreement was signed in 1976, the "presently being marketed for" language refers only to those products being marketed by Sensormatic for theft detection in 1976. This reading does not prevent post-1976 products from being covered by the Agreement, however. Whether a newly-developed Sensormatic product is a "Detection Device" covered by the Agreement depends on whether it is a "successor" to the 1976 Sensormatic System. Moreover, the "presently being marketed for" language applies only to the question of whether a product at issue is a "Detection Device," not whether the product is used for "Automatic Theft Detection." Therefore these marketing materials do not create a genuine issue of material fact with regard to whether RFID products are used for "Automatic Theft Detection."

As there is no material fact issue regarding whether RFID products are used for "Automatic Theft Detection," we hold that the

16

district court did not err in awarding summary judgment to Sensormatic.  We need not consider whether RFID constitutes a "Detection Device" under the contract, as coverage under the Agreement requires both that a product be used for "Automatic Theft Detection" and be a "Detection Device."

III.

The rule against claim splitting is one of the principles of res judicata.  See Nash County Bd. of Educ. v. Biltmore Co., 640 F.2d 484, 490 (4th Cir. 1981).  Consequently, the standard of review on the district court's decisions to dismiss two of SSC's claims as violations of the rule against claim splitting is de novo.  Pueschel v. United States, 369 F.3d 345, 354 (4th Cir. 2004)("We review de novo a district court's application of the principles of res judicata").

A.

In Sensormatic I, SSC sought leave to file an amended complaint after the district court's deadline for filing an amended complaint had passed.  This claim was based on the Winner Agreement's addendum making access control products part of the Winner Franchise.  SSC sought to use the MFC clause to require Sensormatic to offer it the same terms as Winner, thus making access-control products part of the SSC Franchise.  Although the

17

Winner Agreement and addendum were signed in 1978, SSC did not learn of the addendum until May 9, 2003. The <u>Sensormatic I</u> court denied SSC's request for leave to amend on the ground that SSC learned of the addendum approximately one month prior to the deadline for filing an amended complaint yet failed to timely amend. That court held that SSC's failure to timely amend was without good cause and denied the request. SSC asserted the same claim in a new lawsuit, <u>Sensormatic II</u>, the day after the <u>Sensormatic I</u> court denied its motion for leave.

The rule against claim splitting "prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action." <u>Myers v. Colgate-Palmolive Co.</u>, 102 F. Supp. 2d 1208, 1224 (D. Kan. 2000). In a claim splitting case, the second suit will be barred if the claim involves the same parties and "arises out of the same transaction or series of transactions as the first claim." <u>See Trustmark Insur. Co. v ESULU, Inc.</u>, 299 F.3d 1265, 1269-70 (11th Cir. 2002). When one suit is pending in federal court, a plaintiff has no right to assert another action "on the same subject in the same court, against the same defendant at the same time." <u>Curtis v. Citibank, N.A.</u>, 226 F.3d 133, 139-39 (2d Cir. 2000). Often, the rule against claim splitting applies to prevent a plaintiff from filing a new lawsuit after the court in an earlier action has denied the plaintiff's request for leave to amend to add the claims

18

later asserted in the second lawsuit. See <u>Northern Assurance Co.</u> <u>Of Am. v. Square D. Co.</u>, 201 F.3d 84, 87-88 (2d Cir. 2000)(citing string of cases dismissing claim in second suit that was duplicative of claim sough to be amended to first suit); <u>Devoc,</u> <u>Inc. v. NGC</u>, 309 B.R. 458, 465-66 (Bankr. N.D. Tex. 2004)(same).

In support of its motion for leave to amend the <u>Sensormatic I</u> complaint, SSC argued that amendment was permissible "because the new breach of contract claim is based upon the same Restated Franchise Agreement that is currently at issue." In <u>Sensormatic II</u>, SSC argued against dismissal on claim splitting grounds because the claims in <u>Sensormatic II</u> are based on the Winner Agreement, rather than the SSC-Sensormatic Franchise Agreement that is the subject of <u>Sensormatic I</u>. Notwithstanding the fact that SSC has taken fundamentally different positions in arguing two different motions, its argument in <u>Sensormatic II</u> is incorrect. The factual allegations to be resolved in <u>Sensormatic II</u> do not concern the validity or scope of the Winner addendum, but the scope of the SSC-Sensormatic Franchise Agreement.

Dismissal pursuant to the rule against claim splitting is appropriate in this case for two reasons. First, it is apparent that SSC sought to circumvent the <u>Sensormatic I</u> court's decision to deny SSC's motion for leave to file an amended complaint. Presuming that SSC felt that this denial was in error, it should have waited to appeal the decision until <u>Sensormatic I</u> becomes

19

final.  Second, the access-control claims at issue are "on the same subject in the same court, against the same defendant at the same time," Curtis, 226 F.3d at 139-140, and therefore are in violation of the rule against claim splitting.  Consequently, we believe that the district court properly dismissed SSC's access-control claims in Sensormatic II.

B.

In Sensormatic III, SSC brought suit under the MFC clause seeking more favorable commission rates for the sale of CCTV products.  Whether certain CCTV products are covered by the Franchise Agreement was a subject of dispute between SSC and Sensormatic in the early 1980s.  A 1984 Settlement resolved the dispute and established that Sensormatic pay SSC a fifty percent of gross profits commission rate for CCTV sales in the SSC territory rather than the forty percent of gross sales rate paid for all other Sensormatic products covered by the Agreement.  The Winner court held that these CCTV products were covered by the Winner Franchise Agreement and therefore subject to the forty percent of gross sales commission rate.  As Winner did not dispute this issue in the 1980s it did not get resolved until Winner and Sensormatic engaged in litigation in the late 1990s.  SSC now seeks to invoke the MFC clause to obtain the more favorable commission rate Winner obtained in court.

20

SSC argues that it failed to bring this claim in <u>Sensormatic I</u> or <u>Sensormatic II</u> because it did not obtain the more favorable rights with respect to the sale of CCTV products until after the Third Circuit affirmed the <u>Winner</u> court's decision. This argument is not persuasive because SSC brought its RFID claims in <u>Sensormatic II</u> — claims that the district court decided did not violate the rule against claim splitting — based on the <u>Winner</u> court's decision that the Winner Agreement covered RFID products. SSC offers no plausible reason why it had to wait for the Third Circuit's decision before bringing its CCTV claims but was able to bring its RFID claims in the wake of the district court's decision in <u>Winner</u>. Consequently, SSC offers no plausible reason why it did not bring these claims in <u>Sensormatic II</u>. As this is an action "on the same subject in the same court, against the same defendant at the same time," <u>Curtis</u>, 226 F.3d at 139-39, we hold that the district court did not err in dismissing <u>Sensormatic III</u> on improper claim splitting grounds.

IV.

Section 12.H of the Agreement states that "the termination of this Agreement for any reason whatsoever shall not terminate the obligations of the parties . . . and, in particular, shall not terminate the obligation of the Franchisor to make" certain specified payments. Sensormatic seeks declaration that this clause

21

is a liquidated damages provision, granting it the authority to terminate the Agreement "for any reason whatsoever" and pay only the contractually specified payments. Section 12.C states that "[t]he Franchisor shall have the right, at its option, to terminate this Agreement and the franchise if" the franchisee fails in its marketing commitments, defaults on specified covenants in the Agreement, becomes insolvent, or ceases to continue in the business of selling or servicing the equipment covered by the Agreement. SSC argues that Section 12.H applies only to terminations made for the reasons outlined in Section 12.C. SSC argues that if Section 12.H requires that Sensormatic pay only liquidated damages for terminations that are not specifically authorized by Section 12.C, then the Agreement makes no distinction between valid and invalid terminations and the language in Section 12.C is superfluous. The district court so found and granted SSC's summary judgment motion.

The Agreement provides and the parties agree that Florida law governs the Franchise Agreement. Florida contract law requires that courts give effect to a contract's plain meaning. See, Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 132 (Fla. 2000)("It is axiomatic that when construing a document, courts should give effect to the plain meaning of its terms"). A fair reading of the phrase "for any reason whatsoever" is that it refers to all possible reasons, not to a narrower subset of reasons. Consequently the plain meaning of the phrase "for any

22

reason whatsoever" in Section 12.H is that the phrase applies to any and all reasons for termination, not just the reasons specified in the contract. Indeed, Florida courts have held that a termination clause that grants the parties the right to terminate "for any reason whatsoever" permits the parties to terminate for "good cause, bad cause, or no cause." Terranova Corp. v. 1550 Biscayane Assocs., 847 So. 2d 529, 532 (Fla. Dist. Ct. App. 2003).

SSC argues that interpreting the Agreement according to its plan meaning would result in a conflict between Section 12.H and the contract provisions outlining specific grounds for termination by the franchisor. Where contract language is ambiguous, "an interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable." Siedle v. Nat'l Ass'n of Sec. Dealers, Inc., 248 F. Supp. 2d 1140, 1144 (M.D. Fla. 2002)(quoting Golden Door Jewelry Creations v. Lloyds Underwriters Non-Marine Ass'n, 117 F.3d 1328, 1338 (11th Cir. 1997)). SSC argues that applying Section 12.H's limitation of liability clause to all terminations results in an outcome where Section 12.C is rendered useless. This argument ignores the fact that Section 12.H's limitation of liability does not bar claims for money owed prior to termination. Because the Agreement is unambiguous, the plain meaning of the phrase "for any reason whatsoever" is that Section 12.H's limitation of liability

23

applies to all terminations, including terminations for reasons not specifically described in the Agreement.

The Fifth Circuit, in Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc., 257 F.3d 449 (5th Cir. 2001), interpreting a Texas contract with a similar provision, considered whether to enforce a contract clause limiting liability for termination "for any reason whatsoever" when the contract also specified grounds for termination. The court considered the argument that "the limitation of liability clause renders meaningless the termination provisions." Id. at 456. The court held that the limitation of liability clause applied to terminations made for the causes defined by the contract as well as to all other terminations. Id. at 457. The court reasoned that the limitation of liability clause "does not render meaningless the section of the contract setting out specific grounds of termination" as the limitation clause does not bar claims for monies owed prior to termination. Id. at 456-57. Furthermore, the court noted that the contract specifically stated that no party was to be liable for incidental, special, or consequential termination damages. Id. at 457.

Here, the parties explicitly excluded any damages not described in Section 12.H and specifically identified lost profits as non-recoverable. Section 12.H is clear and unambiguous. The language in Section 12.H means what it says and should be given plain meaning.

24

V.

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part and remanded for entry of summary judgment in favor of Sensormatic on its claim for declaratory judgment and any further proceedings consistent with this opinion.

AFFIRMED IN PART,
REVERSED IN PART,
AND REMANDED