847 So.2d 529 (2003)
TERRANOVA CORPORATION, Appellant,
v.
1550 BISCAYNE ASSOCIATES, CORP., Appellee.
No. 3D02-1500.
District Court of Appeal of Florida, Third District.
April 16, 2003.
Rehearing Denied June 18, 2003.
*530 Grumer & Levin, P.A. and Keith T. Grumer (Ft.Lauderdale), for appellant.
Clarke, Silverglate, Campbell, Williams & Montgomery and Jay A. Gayoso, for appellee.
Before GODERICH, GREEN, and FLETCHER, JJ.
GREEN, J.
Terranova Corporation ("Terranova") appeals a final summary judgment interpreting the amount of commission due it pursuant to an exclusive leasing listing agreement ("listing agreement") with 1550 Biscayne Associates Corporation ("owner"). Terranova asserts that the trial court correctly determined it was entitled to a commission, but incorrectly determined the commission rate to be 1 1/2%. Based upon our construction of the listing agreement, we conclude that Terranova was entitled to a commission rate of 3%. For that reason, we affirm the summary judgment, but reverse that portion awarding Terranova a commission rate of 1 1/2%.

A. The Listing Agreement
Terranova entered into the listing agreement with the owner in April, 1999 for the purpose of having Terranova obtain tenants at the owner's building. The agreement set forth the terms under which Terranova would be paid a commission by the owner for procuring tenants at the owner's commercial building depending upon the status of the tenant and whether the listing agreement had been terminated by the parties. Specifically, the relevant provisions of the listing agreement provided in pertinent part that:
3(f) ... Owner agrees to pay Agent [Terranova] a leasing commission equal to six percent (6%) of the Gross Rental Value of any new lease ...
* * *
(g) Should any tenant who executes a lease at the Property as a result of Agent's efforts, later expand or renew its lease after termination of this Agreement, Agent shall still be due a commission as though this Agreement remained in full force and effect except the amount of payment due shall be one-half the rate provided for herein and no liability of Owner for any expansion or renewal after termination of this Agreement shall last longer than the earlier of the transfer of Owner's interest in the property or twenty four months (24) after termination of this Agreement.
* * *
(i) While this Exclusive Leasing Agreement is in effect, should any tenant with a current lease for space at the Property at the commencement of this Agreement enter into a new lease for different space, Agent shall receive half compensation. If the new lease is for the same space currently occupied by the tenant, the compensation to Agent shall be one *531 half the normal rate. Should an existing tenant extend its lease via a pre-existing option to renew, Agent shall not be entitled to any compensation. Commissions shall only be due on the net new lease value taking into account the early cancellation of any prior lease.
* * *
(k) In the event of termination of this Agreement, Owner shall remain obligated to pay Agent a full commission for any tenant(s) introduced to the Property by Agent, where the tenant(s) execute a lease with Owner within six months of the effective date of termination or longer if Agent and prospective tenant are in active negotiations. Agent agrees to submit a list of any such tenants to Owner within thirty (30) days from the effective date of termination.
* * *
6. Term of Agreement: Termination
(a) This agreement shall commence upon execution and remain in effect until canceled or terminated pursuant to the terms hereof.
(b) This Agreement may be terminated for any reason whatsoever as of the last day of any month hereof by Owner upon at least sixty (60) days prior written notice to Agent ...
(c) Agent may terminate this Agreement as of the last day of any month hereof by Agent upon at least sixty (60) days prior written notice to Owner ...
* * *

B. Lease with The Kitchen, Inc.
During the term of the listing agreement, Terranova procured The Kitchen, Inc. ("The Kitchen") as a tenant for the owner's building. On November 9, 1999, the owner executed a lease with The Kitchen which gave The Kitchen the right of first refusal to expand its space at the property if another tenant vacated. Terranova was paid its 6% commission for The Kitchen lease pursuant to the listing agreement.
On January 6, 2000, one of the owner's tenants notified the owner that it would not exercise its lease renewal rights for the first floor of the property. Four days later, the owner approached The Kitchen and invited it to negotiate a new lease for this additional space. The owner did not notify Terranova of any of these communications.[1]
Approximately one week later or January 14, 2000, the owner notified Terranova of its termination of the listing agreement effective March 31, 2000, pursuant to paragraph 6(b) of the listing agreement. Approximately two weeks later, the owner and The Kitchen entered into an amendment of lease substantially expanding The Kitchen's leasehold interest to include the first floor of the property. The owner did notify Terranova of this amendment of lease.
When Terranova found out about the amendment of lease, it demanded 6% commission on the additional gross rental value of the lease expansion under the listing agreement. The owner refused, and Terranova commenced this litigation by filing a two-count complaint for breach of the listing agreement and unjust enrichment. The owner did not dispute that it owed *532 Terranova a commission, but it did dispute the amount owed.
Terranova moved for summary judgment on its breach of contract count and the owner moved for summary judgment on both counts of the complaint. The trial court granted Terranova's motion for summary judgment, and construed paragraphs 3(g) and (i) of the listing agreement together to conclude that Terranova was entitled to a commission of 1 1/2% of the lease expansion which the parties stipulated to be $49,595.28. The trial court also granted the owner's motion for summary judgment on Terranova's unjust enrichment count based upon its conclusion that a party seeking to enforce an express contract could not simultaneously disavow the existence of the express contract and seek equitable relief based on a quasi contract, citing Tobin & Tobin Ins. Agency, Inc. v. Zeskind, 315 So.2d 518, 520 (Fla. 3d DCA 1975); Santovenia v. Confederation Life Ass'n, 460 F.2d 805, 811 (5th Cir.1972).
Terranova has filed the instant appeal complaining solely about the lower court's determination that it was entitled to only a 1 1/2% percent commission rate under the listing agreement.[2] Terranova essentially argues that it is entitled to a 6% commission pursuant to paragraph 3(k) of the listing agreement, and that the trial court erred in reducing its commission pursuant to paragraphs 3(g) and (i) based upon the undisputed evidence of the owner's bad faith termination of the listing agreement. We agree with Terranova that it is entitled to more than the 1 1/2% commission rate awarded by the lower court. We, however, disagree that Terranova is entitled to the full 6% rate outlined in paragraph 3(k) of the listing agreement.
Initially, we note that we are required to give effect to the clear and unambiguous language of the listing agreement, although certain provisions of the agreement were seemingly drafted with anything but a modicum of clarity. See Hurt v. Leatherby Ins. Co., 380 So.2d 432, 433 (Fla.1980) (finding that where contractual language is clear and unambiguous, courts cannot indulge in construction or interpretation of its plain meaning). See also Kraft v. Mason, 668 So.2d 679, 685 (Fla. 4th DCA 1996)(stating that "clear and unambiguous contract terms should be construed as written."). Since the rate of Terranova's commission apparently hinges upon whether this listing agreement had been effectively terminated prior to the owner's amendment of its lease with The Kitchen, we will address Terranova's arguments on appeal in reverse order.
Terranova asserts that it should be awarded its full 6% commission rate based upon the undisputed evidence that the owner's bad faith termination of the listing agreement was an effort to defeat its commission. We disagree. The listing agreement clearly permitted either party to terminate this agreement "for any reason whatsoever." We construe this to mean that either party was free to cancel this agreement for good cause, bad cause, or no cause. Given this expressed right of termination for any reason, we conclude that the implied covenant of good faith which would otherwise attach to a contract has no applicability to this dispute. See Flagship Nat'l Bank v. Gray Distrib. Sys., Inc., 485 So.2d 1336, 1340 (Fla. 3d DCA 1986) (finding that good faith obligation may not be relied upon to override express terms of a contract). See also Avatar Dev. v. De Pani Constr., 834 So.2d 873, 876 (Fla. 4th DCA 2002) (stating that "an implied covenant of good faith cannot be used to vary the unambiguous terms of a written *533 contract and when the parties negotiate `a fully specified, unambiguous contract, this court is not at liberty to change their bargain.'")(citing Indian Harbor Citrus, Inc. v. Poppell, 658 So.2d 605, 607 (Fla. 4th DCA 1995)).
Since we conclude that this listing agreement had been effectively terminated by the owner prior to the owner's amendment of lease with The Kitchen, we return to the question of the appropriate commission for Terranova. We cannot agree with the owner that paragraphs 3(g) and (i) must be construed together for a 1 1/2% commission rate because in our view, 3(i) has no applicability whatsoever to the current dispute. Based upon the plain language of (3)(i), it applies while the listing agreement is in effect to a tenant who had a "lease for space at the property at the commencement of this agreement." The Kitchen was not a tenant at the property at the commencement of the listing agreement, therefore, this provision is inapplicable.
Terranova urges that paragraph 3(k) is the governing provision, and at the very least, paragraph 3(g) governs as they both address its commission rate in the aftermath of the termination of the listing agreement. Although both provisions do indeed address commission rates owed to Terranova in the event of a termination of the listing agreement, we conclude that 3(g) addresses the precise factual scenario presented in this case, and 3(k) addresses commissions owed to Terranova upon termination in more general terms. In construing this agreement, the more specific provision (i.e. 3(g)) must supersede and govern the more general provision (i.e.3(k)). See Proser v. Berger, 132 So.2d 439, 441 (Fla. 3d DCA 1961)(stating that "... specific provisions of an agreement are to be given such effect as to supersede provisions in conflict with them which have been stated in general terms."). See also J.M. Flowers v. Miskoff, 233 So.2d 201, 205 (Fla. 4th DCA 1970) (holding that "A specific provision ... will normally be construed as eliminating the unspoken, the general, and the unclear."). Here, pursuant to 3(g), Terranova would be entitled to receive one-half the rate provided for in the agreement which we construe to mean to be one half of 6%, or 3%.
We therefore affirm the summary judgment, but reverse that portion awarding the appellant only 1 1/2% commission, and remand with directions that it be given 3% commission.
Affirmed in part and reversed and remanded with directions.
NOTES
[1] For this reason, Terranova maintains that the owner violated paragraph 3(b) of the listing agreement which provides that:

All inquiries for any leases, renewals, or agreements for the rental of the Property shall be referred to Agent, and all negotiations connected with such leasing prospects shall be conducted solely by or under Agent's direction.
[2] The owner has filed no cross-appeal.