PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHARLENE ROSS,

       *Plaintiff-Appellant,*

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver of
Washington Mutual Bank,

       *Defendant-Appellee.*

No. 08-1851

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Dever III, District Judge.
(5:06-cv-00468-D)

Argued: September 22, 2010

Decided: October 29, 2010

Before WILKINSON, KING, and GREGORY,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge King and Judge Gregory joined.

**COUNSEL**

Christopher Wyatt Livingston, White Oak, North Carolina, for Appellant. Thomas G. Hooper, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Charlotte, North Carolina, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Charlene Ross brought claims against Washington Mutual Bank ("WaMu") for false reporting of credit information and unfair debt collection practices. But she tarried too long, and by filing outside of the Fair Credit Reporting Act's ("FCRA") two-year statute of limitations she lost any FCRA claims she may have had, whatever their merit.

Ross has tried to skirt this deficiency by bringing several state law claims. Those claims, in the main, are preempted by 15 U.S.C. § 1681t(b)(1)(F), the FCRA's preemption provision. And though Ross contends her claims are expressly authorized by another FCRA provision, 15 U.S.C. § 1681h(e), she fails to present evidence that WaMu acted with the "malice or willful intent to injure" necessary to benefit from this section. Ruling otherwise would require us to broaden the definition of "malice" to include mere negligence, and such a holding would vitiate both the FCRA's statute of limitations and its preemption provision.

Only Ross's unfair debt collection practices claim survives preemption, but it too fails because she cannot prove proximate causation, an element of her state law claim. The district court awarded WaMu summary judgment on both of these claims, and we now affirm.

## I.

James Williams executed a mortgage on a home on May 8, 1996. This loan was eventually assigned to WaMu, and WaMu held it for all periods relevant to this case. The FDIC is involved in this case as the receiver of Washington Mutual Bank. On or about August 16, 1996, Williams quitclaimed his interest in the property to Charlene Ross, and the two married the following month. The relationship soured, and in April 2001 Ross secured a domestic violence protective order evicting Williams. Ross obtained another order the following month naming her as the property's owner. Williams, however, retained sole responsibility for the loan.

Ross contacted WaMu about this arrangement in July 2001. At that time, Ross confirmed that any payments she made would be properly credited to the mortgage, requested an IRS 1098 form to claim a tax deduction for mortgage interest, and asked that she receive monthly mortgage statements at the address of the encumbered home. Ross then sent WaMu the necessary documentation, including her social security card, the May 2001 order, and the August 1996 quitclaim deed. In the process of fulfilling Ross's requests, WaMu mistakenly listed Ross's name on the mortgage.

The loan went into default when no payments were made from June 2001 through September 2001. On September 11, 2001, Ross discovered that WaMu had reported negative information about her to consumer reporting agencies ("CRAs"). WaMu took this action based on its mistaken belief that Ross was responsible for the loan. Ross contacted WaMu, but WaMu informed her that it did not know why the name on the loan was changed. She also contacted the CRAs directly, but they could only confirm that WaMu had indeed placed the negative trade line on her report.

WaMu began pursuing foreclosure proceedings in October 2001, but in February 2002 Ross made the payments neces-

sary to reinstate the mortgage. Later in 2002, Ross contacted WaMu about the loan appearing on her credit reports. WaMu conducted an investigation, suspended credit reporting for the loan, and notified Ross of these actions in a September 27, 2002 letter.

But in June 2003 the loan again went into default. In August 2003, Ross notified WaMu that one of the CRAs was still reporting the loan on her credit report. WaMu conducted another investigation, acknowledged that Ross was not responsible for the loan, and directed the CRAs to remove the loan from Ross's credit report. The loan has not been on Ross's credit reports since December 31, 2003, but as a result of the negative trade line, she alleges she was denied credit on multiple occasions, including a business loan that Ross claims would have allowed her to open an assisted-living facility that would have made $3,000,000 in annual profits.

Other events occurring in Ross's life during this time period are relevant to her claims. Between 2001 and 2003, Ross experienced numerous difficulties while employed as a high school teacher in the Charlotte-Mecklenburg school system. During this time, she pursued two employment discrimination charges and claims to have developed carpal tunnel syndrome and Post Traumatic Stress Disorder ("PTSD"). This is also when WaMu, acting on its mistaken belief that Ross was responsible for the loan, placed debt collection calls to Ross's work.

WaMu again began pursuing foreclosure proceedings in February 2004. On May 21, 2004, Ross filed suit in North Carolina state court seeking to enjoin the foreclosure. She also alleged North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") claims against WaMu. The court denied her motion for a preliminary injunction, and the trustee sold the home. On August 25, 2005, Ross dismissed her lawsuit against WaMu without prejudice.

Then on August 22, 2006, Ross again filed a complaint against WaMu in North Carolina state court. Ross alleged common law defamation claims, violations of the FCRA, and violations of the NCUDTPA. Ross sought actual, statutory, and punitive damages for her wrongfully damaged credit scores, emotional distress, poor health, lost income, and lost business opportunities. WaMu removed the action to federal court on November 8, 2006. WaMu then moved for summary judgment, which the district court granted on July 2, 2008. *Ross v. Washington Mutual Bank*, 566 F. Supp. 2d 468, 485 (E.D.N.C. 2008). Ross now appeals the grant of summary judgment on her NCUDTPA claims.

## II.

The NCUDTPA regulates trade practices. N.C. Gen. Stat. § 75-1.1. Included within this statutory scheme are several consumer protection provisions. *Id.* §§ 75-1.1, 75-50 to 75-56. Article 1 of the NCUDTPA contains a general ban on "unfair or deceptive acts or practices in or affecting commerce." *Id.* § 75-1.1(a). Article 2 of the NCUDTPA is the North Carolina Debt Collection Act ("NCDCA"), which prohibits various unfair debt collection practices. *Id.* §§ 75-50 to 75-56. We will first evaluate Ross's claims under Article 1 of the NCUDTPA before turning to her NCDCA claims under Article 2.

## A.

Ross claims that WaMu's reporting of incorrect information to CRAs violates the NCUDTPA, which prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). But the FCRA's preemption provision, 15 U.S.C. § 1681t(b)(1)(F), preempts this claim, regardless of its underlying merits.

The FCRA is a comprehensive statutory scheme designed to regulate the consumer reporting industry. 15 U.S.C.

§ 1681(a). Congress recognized both the "vital role" of CRAs and the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *Id.* CRAs provide a critical economic service by collecting and transmitting consumer credit information. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 223 (3d Cir. 1997). But CRAs can make mistakes by reporting inaccurate credit information. *See id.* These errors are detrimental to the consumer, the creditor, and the economy as a whole. *See id.*

Accordingly, Congress determined that while CRAs must be allowed to perform their function, a regulatory framework was necessary to prevent errors in credit reporting and remedy those that do occur. In 1970, Congress accommodated both of these interests by enacting the FCRA, a "comprehensive series of restrictions on the disclosure and use of credit information assembled by consumer reporting agencies." *FTC v. Manager, Retail Credit Co.*, 515 F.2d 988, 989 (D.C. Cir. 1975). The FCRA "has been drawn with extreme care, reflecting the tug of the competing interests," and courts must respect the balance struck by Congress when interpreting its provisions. *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1060 (9th Cir. 2002).

As originally enacted, the FCRA generally permitted state regulation of the consumer reporting industry. With but few exceptions, the original preemption provision, 15 U.S.C. § 1681t(a), preempted state laws only "to the extent that those laws are inconsistent with any provision of [the FCRA]." As part of the ongoing process of fine-tuning this statutory scheme, Congress amended the FCRA with the Consumer Credit Reporting Reform Act of 1996 ("CCRRA"). Pub. L. No. 104-208, 110 Stat. 3009, 3009-426 to -455. The CCRRA added a strong preemption provision, 15 U.S.C. § 1681t(b), to this comprehensive legislative framework. The purpose of this new subsection was, in part, to avoid a "patchwork system of conflicting regulations." Michael Epshteyn, Note, *The Fair*

*and Accurate Credit Transactions Act of 2003: Will Preemption of State Credit Reporting Laws Harm Consumers?*, 93 Geo. L.J. 1143, 1154 (2005).

Included within the new subsection added by the CCRRA is 15 U.S.C. § 1681t(b)(1)(F), the preemption provision at issue in this case. It states:

> No requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under . . . (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . .

Section 1681s-2 describes the responsibilities of those who report credit information to CRAs. Section 1681s-2(a) explains the "[d]uty of furnishers of information to provide accurate information," which includes correcting any errors in reporting. 15 U.S.C. §§ 1681s-2(a)(1)-(2). Section 1681s-2(b) contains the duties of furnishers of information "[a]fter receiving notice . . . of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency." 15 U.S.C. § 1681s-2(b)(1). These duties include conducting an investigation into the dispute and correcting any errors discovered with the CRAs. *Id.*

Ross's NCUDTPA claim under § 75-1.1 runs into the teeth of the FCRA preemption provision. Her claim concerns WaMu's reporting of inaccurate credit information to CRAs, an area regulated in great detail under §§ 1681s-2(a)-(b). Because Ross's NCUDTPA claim seeks to use § 75-1.1 as a "requirement or prohibition" under North Carolina law concerning "subject matter regulated under section 1681s-2," it is squarely preempted by the plain language of the FCRA. 15 U.S.C. § 1681t(b)(1)(F).

B.

Ross, however, argues that her claim is expressly authorized by 15 U.S.C. § 1681h(e) because WaMu acted with "malice or willful intent to injure." This argument is unavailing.

Our analysis begins with an overview of § 1681h(e). Section 1681h regulates the disclosures that CRAs must provide to consumers under § 1681g. Section 1681g requires CRAs to disclose to consumers the information in their credit file upon request. Sections 1681h(a) through 1681h(d) contain the procedures CRAs must follow when providing these disclosures. Section 1681h(e) then states:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

Congress intended this section's general bar on defamation, invasion of privacy, and negligence actions to be the quid pro quo for providing full disclosure under the FCRA. *See Thornton v. Equifax, Inc.*, 619 F.2d 700, 703 (8th Cir. 1980). The only exception to this bar is a narrow one, requiring proof of "malice or willful intent to injure [the] consumer." 15 U.S.C. § 1681h(e).

Thus, the § 1681h(e) authorization Ross seeks involves a two-step inquiry. First, we ask whether the claim falls within the scope of § 1681h(e), which includes only claims "based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report." The second step in the analysis involves determining whether the "malice or willful intent to injure" exception to the general bar against state law actions applies. 15 U.S.C. § 1681h(e).*

C.

As an initial matter, it is unclear that Ross's contentions even fall within the scope of § 1681h(e). For starters, any cause of action Ross may have had under § 1681n or 1681o is now plainly time-barred by the FCRA's statute of limitations. *See* 15 U.S.C. § 1681p. Turning to the body of § 1681h(e), Ross must show that her action is "based on information disclosed pursuant to section 1681g, 1681h, or 1681m . . . or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report." 15 U.S.C. § 1681h(e). Sections 1681g and 1681h, as noted above, apply only to CRAs. 15 U.S.C. §§ 1681g, 1681h. WaMu is not a CRA. *See* 15 U.S.C. § 1681a(f). Section 1681m applies only to users of consumer reports. 15 U.S.C. § 1681m. WaMu is not a user of consumer reports vis-à-vis Ross. The final § 1681h(e) category for actions "based on information disclosed by a user of a consumer report to or for

---

*If Ross could meet the steps of the § 1681h(e) analysis, we would next have to confront the alleged conflict between § 1681h(e) and § 1681t(b)(1)(F). Courts have taken a variety of approaches to resolving this conflict. *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1165-67 (9th Cir. 2009) (reviewing the case law regarding the possible conflict between § 1681h(e) and § 1681t(b)(1)(F)). Our disposition of this case on other grounds means we need not address this issue.

a consumer against whom the user has taken adverse action, based in whole or in part on the report" does not appear to apply because WaMu neither used Ross's consumer report nor took adverse action based on information in Ross's report or information disclosed by a user. 15 U.S.C. § 1681h(e). Thus, it is not clear that Ross's NCUDTPA claim under § 75.1-1 falls within the ambit of § 1681h(e). *See Ross v. Washington Mutual Bank*, 566 F. Supp. 2d 468, 474-78 (E.D.N.C. 2008); *Johnson v. JP Morgan Chase Bank*, 536 F. Supp. 2d 1207, 1214-15 (E.D. Cal. 2008); *Knudson v. Wachovia Bank*, 513 F. Supp. 2d 1255, 1258-60 (M.D. Ala. 2007).

Even if we assume arguendo that § 1681h(e) applies, Ross cannot meet the second step of the analysis. Viewing the summary judgment record in the light most favorable to Ross, WaMu did not act with the "malice or willful intent to injure" necessary for Ross to qualify for the § 1681h(e) exception. 15 U.S.C. § 1681h(e).

As a preliminary matter, the FCRA does not define "malice." Courts are split on whether state or federal law governs the meaning of "malice" in § 1681h(e). Ross cites North Carolina law for the definition:

> Actual malice may be proven by evidence of ill-will or personal hostility on the part of the declarant or by a showing that the declarant published the defamatory statement with knowledge that it was false, with reckless disregard for the truth or with a high degree of awareness of its probable falsity.

*Dobson v. Harris*, 530 S.E.2d 829, 837 (N.C. 2000) (internal quotation marks omitted). And this court has previously looked to state law for the definition as well. *Beattie v. Nations Credit Financial Services Corp.*, 69 F. App'x 585, 590-91 (4th Cir. 2003) (looking to South Carolina law for the definition of "malice").

Other courts have reasoned that substantive aspects of federal statutes should be governed by federal law. *See, e.g.*, *Thornton v. Equifax, Inc.*, 619 F.2d 700, 705 (8th Cir. 1980). These courts have suggested the actual malice standard from *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), as an appropriate definition. *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1168 (9th Cir. 2009); *Morris v. Equifax Information Services, LLC*, 457 F.3d 460, 471 (5th Cir. 2006); *Thornton*, 619 F.2d at 705. Accordingly, these courts look to whether the statement in question was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.*, 376 U.S. at 280.

We need not resolve this matter because Ross cannot create a genuine issue of material fact under either definition. Furthermore, the critical aspect of malice at issue in this case—whether WaMu reported information it knew was false—is included under both the state and federal definitions.

Ross argues that WaMu acted with malice because WaMu reported negative loan information about Ross to CRAs even though it knew Ross was not responsible for the loan. Ross principally relies on an August 7, 2003 note in WaMu's records as the basis for this contention. This note states, "We reported [the loan] on her credit report which we cannot as she does not have note liability. We corrected the credit reports and she will no longer be reported as having a loan w/ WaMu." In Ross's view, this note, coupled with the fact that one CRA continued to report Ross's loan into December 2003, is evidence that WaMu continued to report negative credit information even after it learned of its falsity.

But this cannot be. Ross has not brought forth evidence proving the key element of malice—that WaMu knew the loan information was incorrect at the time of reporting. Quite the contrary. The record is replete with evidence that WaMu made a regrettable but honest mistake and took action to remedy this error once Ross brought it to WaMu's attention.

WaMu's initial error, putting the loan in Ross's name, occurred in the course of its efforts to comply with Ross's wishes. Ross presented a unique and rather complicated set of circumstances. She lived in the home financed with the mortgage in question, requested that monthly mortgage statements be mailed to her, and asked for a mortgage interest deduction form. Yet she was not the one responsible for the loan. In the course of completing the paperwork to accommodate Ross's situation, WaMu mistakenly put the loan in Ross's name.

When Ross notified WaMu that it was reporting false loan information to the CRAs, WaMu suspended credit reporting on the loan and sent a letter to Ross notifying her of its remedial efforts. When Ross later informed WaMu that one CRA was still reporting the loan, WaMu again took corrective action, contacting the CRA and asking it to remove the loan from Ross's report. These are not the actions of a malicious business entity. They are evidence of WaMu's efforts to right its wrong.

The linchpin of Ross's argument is that one CRA continued to report incorrect loan information after WaMu knew of its initial error and took corrective action. Ross asks us to infer from this that WaMu had not ceased its reporting of incorrect loan information. We must draw all reasonable inferences in Ross's favor, but Ross has not presented evidence supporting this inference. And, absent specific evidence, Ross's contention that WaMu "transmitted the false information is merely an inference from the fact that [one CRA] possessed the information at later dates." *Rhodes v. Ford Motor Credit Co.*, 951 F.2d 905, 907 (8th Cir. 1991). The Eighth Circuit declined to draw any such inference in *Rhodes*, and so do we. *See id.*

Even if we were to indulge Ross's unsupported inference, Ross still does not create a genuine issue of material fact on the malice issue. All that would be shown is that WaMu behaved negligently with respect to its reporting activities. Banks make mistakes, which include errors in their records.

And while we would hope that these errors could be held to a minimum and corrected the first time they are brought to the bank's attention, the failure to do so does not necessarily constitute malice.

At worst, WaMu needed a couple of tries to remedy fully its initial mistake. This "may evidence the weakness and unreasonableness of [WaMu's] procedure[s], but no malice can be derived from it." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 375-76 (5th Cir. 2001). To be sure, Ross would have a triable case for negligence. But § 1681h(e) requires malice, and there is no evidence that WaMu engaged in the kind of knowing or reckless behavior needed to meet this standard. WaMu may be guilty of sloppy recordkeeping, but that is at most negligence, not malice. *See Cousin*, 246 F.3d at 375-76. Malice is a high bar. The Ninth Circuit declined to find malice even when the defendant used questionable debt collection tactics, threatening, "We're a big bank. You either pay us or we'll destroy your credit." *Gorman*, 584 F.3d at 1169. WaMu's behavior pales in comparison to the conduct of the *Gorman* defendant. Indeed, WaMu was accommodating and took measures to correct its mistake. In short, even granting Ross's unfounded inference, WaMu's behavior, while assuredly not perfect, falls short of the sort of malice intended to be reached by § 1681h(e).

The critical flaw in Ross's view of "malice" under § 1681h(e) is that it presents a false dichotomy. Ross's reasoning implies that every incidence of furnisher conduct must be categorized as either innocent or malicious. But, as noted, there is a third option: negligence. To avoid having the § 1681h(e) exception swallow the rule, we must apply the definition of malice in a way that leaves room for negligence. To do otherwise would allow the NCUDTPA, a state statute imposing treble damages, to scuttle § 1681h(e)'s general bar as well as the FCRA's preemption provision and statute of limitations. Avoiding outcomes such as this is the reason why we interpret exceptions to general rules narrowly. *Choice*

*Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 711 (4th Cir. 2001). And, narrowly interpreted, the § 1681h(e) exception authorizes state lawsuits only for conduct that is truly malicious and not simply careless.

## D.

It is important to keep in mind that this litigation would not have been necessary if Ross had brought her claims within the FCRA's statute of limitations. She might have prevailed on her FCRA claim had it been timely filed. But, instead, the district court was forced to dismiss this claim as time-barred. The rest of the story consists of Ross's efforts to perform an end-run around the FCRA's preemption provision and its statute of limitations. These provisions were intended to encourage the timely filing of FCRA claims, not the belated pursuit of state law actions. The latter is regrettably what we have in the case at bar, and our respect for congressional intent requires us to uphold the trial court's rejection of Ross's Article 1 NCUDTPA claim.

## III.

We now turn to Ross's claim for unfair debt collection practices under Article 2 of the NCUDTPA, the North Carolina Debt Collection Act. The NCDCA prohibits debt collectors from engaging in unfair debt collection practices, including the use of threats, coercion, harassment, unreasonable publications of the consumer's debt, deceptive representations to the consumer, or other unconscionable means. N.C. Gen. Stat. §§ 75-50 to 75-56. In addition to proving conduct prohibited under the NCDCA, an NCDCA plaintiff must also meet the three generalized requirements for all NCUDTPA claims: "(1) an unfair act (2) in or affecting commerce (3) proximately causing injury." *Davis Lake Cmty. Ass'n v. Feldmann*, 530 S.E.2d 865, 868 (N.C. Ct. App. 2000). It is the third requirement, proximate causation, that is at issue in this case.

To survive summary judgment, the non-movant must bring forth "fact-specific and not merely speculative" evidence establishing the cause of her injury. *Driggers v. Sofamor, S.N.C.*, 44 F. Supp. 2d 760, 765 (M.D.N.C. 1998). If there are multiple possible causes for an injury, the plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough." *Id.* (internal quotation marks omitted).

## A.

Ross claims that WaMu violated the NCDCA, largely by making debt collection phone calls to her work and reporting false credit information to CRAs. She seeks damages for non-economic and economic injuries she suffered as a result of WaMu's debt collection practices.

As a preliminary matter, to the extent her claims rely on WaMu's reporting of false credit information, they are pre-empted by 15 U.S.C. § 1681t(b)(1)(F). Ross would be attempting to use the NCDCA as a "requirement or prohibition" of North Carolina law concerning conduct "regulated under section 1681s-2 . . . relating to the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t(b)(1)(F). That leaves only the debt collection phone calls as the basis for her NCDCA claim. But there is no evidence that the phone calls were the proximate cause of any damages at all to Ross, much less of the specific damages she alleges.

## B.

Ross argues that WaMu's debt collection practices were the proximate cause of her non-economic injuries, which include emotional distress and numerous physical ailments. But Ross

fails to provide evidence demonstrating that WaMu's alleged phone calls were the cause of her injuries.

No physician who has treated Ross has attributed any of her conditions to WaMu's alleged practices. Rather, all of her physicians have either pinpointed the cause of her ailments as something other than WaMu's alleged practices or determined that her conditions were of unknown origin. Specifically, Dr. Zofia Bochacki, who treated Ross for PTSD and depression, traced these ailments back to Ross's friction-laden tenure in the Charlotte-Mecklenburg school system. Dr. Kenneth Ashkin, who treated Ross for insomnia, concluded that her insomnia was caused by sleep apnea and periodic limb movement disorder. Dr. Sara Beyer, who treated Ross for migraine headaches and ulcers, pinpointed the cause of the ulcers as a bacterial infection from food Ross had eaten and indicated that the cause of the migraine headaches could not be determined. Dr. Fred Fowler, who treated Ross for esophageal problems, concluded that Ross's condition was of unknown origin. In short, none of Ross's physicians ever mentioned WaMu's debt collection phone calls as a possible source of her ailments.

What is as striking as the opinions of Ross's physicians is the apparent view of Ross herself as to the cause of her medical problems. One would expect a person seeking medical treatment for such conditions as depression and insomnia to mention any major sources of stress in her life. But Ross never mentioned WaMu's debt collection efforts to any of her doctors, with the lone of exception of Dr. Bochacki. Even in her first 21 visits with Dr. Bochacki, during which time Ross explained the stress of working in the Charlotte-Mecklenburg school system, she never once mentioned WaMu's debt collection practices. Instead, Ross waited until the day before Dr. Bochacki's deposition to broach the subject with her.

Finding no support in the medical testimony, the only evidence Ross can bring forth are her own conclusory statements concerning emotional distress. But because "emotional dis-

tress [is] fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996). And this is precisely why "conclusory statements that the plaintiff suffered emotional distress . . . [do not] support[ ] an award of compensatory damages." *Id.* at 1254. Presented only with Ross's conclusory assertions, no reasonable jury could find that WaMu's debt collection practices were the proximate cause of Ross's non-economic injuries.

## C.

Ross also argues that WaMu's debt collection practices were the proximate cause of her economic injuries, which include lost wages and lost profits. But, again, Ross fails to present evidence causally linking these injuries to WaMu's practices.

Ross's lost wages claim stems from her failing a teaching certification exam and ceasing to work for the Charlotte-Mecklenburg school system. It is true that Ross lost wages from these events, but none of them were caused by WaMu's debt collection practices. Ross admits that WaMu's alleged actions did not prevent her from taking the teaching certification exam. And her failure is likely due to her refusing to prepare for the exam. Indeed, Ross acknowledges that she did not study for the exam or even take a practice test. Ross stopped working for the Charlotte-Mecklenburg school system because she went on disability for PTSD and depression, ailments she claims the school system, not WaMu, caused. Therefore, based on Ross's own admissions, WaMu's debt collection practices did not proximately cause any of her lost wages.

Ross bases her lost profits claim on her inability to obtain a business loan to open an assisted-living facility. She asserts that this business would have made over $3,000,000 in annual profits. But Ross's lost profits claim fails on many levels. Per-

haps its most fatal flaw is that the loan denial was alleged by Ross to be due to WaMu's reporting of false loan information, not its debt collection practices. As has been discussed, 15 U.S.C. § 1681t(b)(1)(F) preempts Ross's NCDCA claims to the extent they relate to WaMu's reporting of incorrect credit information. And there is no evidence that WaMu's debt collection phone calls, the only basis for Ross's claim that survives preemption, contributed to the denial of Ross's loan in any way, much less that they were a proximate cause.

Even if Ross managed to overcome this initial hurdle, she has not met her burden under North Carolina law to "prove such losses with reasonable certainty." *McNamara v. Wilmington Mall Realty Corp.*, 466 S.E.2d 324, 330 (N.C. Ct. App. 1996) (internal quotation marks omitted). Indeed, Ross declined to hire an expert to testify concerning her potential profits, failed to submit economic data supporting her rosy predictions, and neglected to supply business records of similar assisted-living facilities. What is more, Ross asks this court to rely on her own self-prepared projected profits in spite of the fact that she has never run a business and has only limited experience in the adult care field. These projections are plainly flawed. Ross works from the unsupported assumptions that she will be able to fill a 140-bed facility, receive a HUD grant, and raise money through private investors.

In sum, in the face of Ross's failure to make any connection between WaMu's debt collection efforts and her lost wages and lost profits, no reasonable jury could find that WaMu's debt collection phone calls were the proximate cause of Ross's economic damages.

IV.

For the reasons above, the judgment of the district court is

*AFFIRMED*.