**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1014**

360 MORTGAGE GROUP, LLC,

>                    Plaintiff - Appellant,

>         v.

HOME POINT FINANCIAL CORPORATION,

>                    Defendant - Appellee,

>         and

LISA B. GLENN,

>                    Defendant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Fox, Senior District Judge.  (5:14-cv-00310-F)

Argued:  May 8, 2018                              Decided:  July 3, 2018

Before KEENAN, WYNN, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion.  Judge Keenan wrote the opinion, in which Judge Wynn and Judge Diaz joined.

**ARGUED:** William Walter Wilkins, NEXSEN PRUET, LLC, Greenville, South Carolina, for Appellant.  Jenna Fruechtenicht Butler, WARD & SMITH, PA, Wilmington, North Carolina, for Appellee.  **ON BRIEF:** Kirsten E. Small, NEXSEN PRUET, LLC,

Greenville, South Carolina, for Appellant. Caroline B. McLean, Gary J. Rickner, WARD & SMITH, PA, Wilmington, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

360 Mortgage Group, LLC, (Mortgage Group) filed this action alleging that Stonegate Mortgage Corporation (Stonegate) misappropriated trade secrets in violation of North Carolina's Trade Secrets Protection Act (Trade Secrets Act), N.C. Gen. Stat. §§ 66-152 to 66-157, after Mortgage Group's former North Carolina employee, Lisa Glenn, resigned to work for Stonegate.[1] Mortgage Group alleged that Stonegate misappropriated trade secrets and caused Mortgage Group's business in North Carolina to decline when Glenn shared certain information with Stonegate, including a list of customers from Mortgage Group's secure online database.[2]

After considering the parties' evidence, the district court awarded summary judgment to Stonegate. Upon our review, we hold that the district court did not err in its award of summary judgment, because Mortgage Group failed to establish that Glenn's transfer of information to Stonegate was a proximate cause of Mortgage Group's loss of revenue in North Carolina.

---

[1] Stonegate recently merged with Home Point Financial Corporation, which is now the named appellee. However, we refer to the defendant-appellee as Stonegate to be consistent with the parties' briefing and the district court's opinion.

[2] Glenn initially was named as a defendant in the case, but Mortgage Group later voluntarily dismissed her from the action. Mortgage Group also alleged numerous other claims not relevant in this appeal.

3

I.

In reviewing the district court's award of summary judgment, we apply a well-established standard of review. We consider the facts and reasonable inferences in the light most favorable to Mortgage Group, the non-moving party. *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 341 (4th Cir. 2017).

Mortgage Group is a nationwide lender that funds and services residential mortgage loans. Mortgage Group relies on third-party brokers to find and originate home loans. Before Glenn joined Mortgage Group, she worked in the North Carolina mortgage industry for many years as an account executive at Wells Fargo, where she was responsible for developing relationships with outside brokers and ensuring a steady supply of home loans for the bank to finance. In July 2011, Mortgage Group hired Glenn as its North Carolina account executive to oversee relationships with Mortgage Group's existing brokers and to recruit new brokers.

Shortly after Mortgage Group hired Glenn, the company experienced significant financial problems. In late 2011, Bank of America provided notice to Mortgage Group that the bank was terminating an agreement to provide funding to Mortgage Group for residential loan transactions and also canceling a separate line of credit. Around that time, some Mortgage Group customers began experiencing delays in receiving funding for their loans. Mortgage Group's volume of new loan sales began to decline precipitously in the third quarter of 2011, both nationally and in North Carolina.

In November 2011, Glenn began discussions with Stonegate, a competing mortgage lender in North Carolina, regarding the possibility of employment. After Stonegate made

4

Glenn an initial offer, Glenn gave Stonegate detailed information about her assigned brokers at Mortgage Group in an effort to secure from Stonegate an offer of increased compensation. This information, which Glenn provided by facsimile, contained printed lists from Mortgage Group's secure online database identifying the brokers with whom Glenn worked and included their telephone numbers, addresses, and whether Mortgage Group had accorded them "approved" status (the fax).[3] The fax also contained several charts showing the amount and present status of Glenn's "funded loans" at Mortgage Group. Additionally, Glenn sent to her personal email address certain broker customer lists, which she had compiled from her own knowledge and by using information from Mortgage Group's secure online database.

In December 2011, after working a total of five months for Mortgage Group, Glenn resigned her position there and joined Stonegate. Mortgage Group assigned all of Glenn's former accounts to James Hodge, who resided in Florida. Mortgage Group's chief operating officer, Andrew WeissMalik, represented that after Glenn resigned, Mortgage Group's loan sales in North Carolina continued to decline in 2012, even though Mortgage Group's nationwide sales began to improve that year. Some North Carolina brokers who were former clients of Mortgage Group stated that Mortgage Group's business declined during this period largely due to lost funding, customer service complaints, and the company's failure to employ a resident account executive in North Carolina after Glenn's departure. Mortgage Group did not hire another resident account executive for North

---

[3] A broker's approval status indicated whether Mortgage Group had approved the broker to refer borrowers to Mortgage Group for mortgage loans.

Carolina until April 2013, and later terminated this replacement in October 2013. Mortgage Group has not employed a North Carolina account executive after October 2013.

In September 2013, Mortgage Group filed suit against Stonegate in state court, and the case later was removed and transferred to the district court. Mortgage Group alleged that Stonegate misappropriated trade secrets, in violation of the Trade Secrets Act, and identified the following sources of information as trade secrets misappropriated by Glenn: (1) the emails that Glenn sent to herself regarding her broker clients; (2) the fax that Glenn sent to Stonegate containing the broker client lists; and (3) Mortgage Group's "broker database," which Glenn used in obtaining some of the broker client information.[4] Mortgage Group further alleged that Glenn's transmission of trade secrets to Stonegate caused Mortgage Group to suffer a loss of business revenue in North Carolina.

After considering the evidence presented, the district court granted Stonegate's motion for summary judgment, holding that the information conveyed to Stonegate did not contain trade secrets. The court further held that even if the information at issue contained some trade secrets, Mortgage Group failed to show that the misappropriation was a proximate cause of any damages Mortgage Group sustained. Mortgage Group timely appealed from the district court's judgment.

---

[4] Although Mortgage Group raised other claims in its complaint, including for injunctive relief, Mortgage Group agrees on appeal that it presently seeks only actual damages for misappropriation under the Trade Secrets Act. Therefore, Mortgage Group has abandoned the other claims on appeal, and we address the district court's judgment only with respect to the claim for actual damages resulting from the alleged misappropriation. *See* Fed. R. App. P. 28(a)(8)(A) ("[An appellant's] argument . . . must contain . . . appellant's contentions and the reasons for them.").

## II.

Mortgage Group argues that the district court erred: (1) in holding that the information Glenn provided to Stonegate did not contain trade secrets; and (2) in concluding that Mortgage Group failed to show that Stonegate's alleged misappropriation was a proximate cause of damages sustained by Mortgage Group.

We review a district court's award of summary judgment de novo. *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 716 (4th Cir. 2014). Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Trade Secrets Act defines a "trade secret" as follows:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3). The statute defines "misappropriation" of a trade secret as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." *Id.* § 66-152(1).

7

The Trade Secrets Act provides that a plaintiff may recover actual damages that were "*caused by misappropriation*." *Id.* § 66-154(b) (emphasis added). Conversely, a plaintiff may not recover damages for misappropriation if a defendant's use of a trade secret "ha[d] no adverse economic effect upon the owner of the trade secret." *Id.* § 66-154(a)(2). Therefore, to succeed on a claim for actual damages under the Trade Secrets Act, a plaintiff must present evidence that the misappropriation was a proximate cause of those damages. *Id.* § 66-154(b); *RLM Commc'ns, Inc. v. Tuschen*, 66 F. Supp. 3d 681, 697–98 (E.D.N.C. 2014) (holding that to obtain actual damages under Trade Secrets Act plaintiff must demonstrate that misappropriation "proximately caused injury to the plaintiff"), *aff'd*, 831 F.3d 190 (4th Cir. 2016); *see also Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 620 S.E.2d 222, 224, 231–32 (N.C. Ct. App. 2005) (applying proximate cause to a claim under N.C. Gen. Stat. § 75–1.1, North Carolina's Unfair and Deceptive Trade Practices Act); *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001) (same); N.C. Gen. Stat. § 66-146(b) (stating that a Trade Secrets Act violation constitutes a violation of North Carolina Unfair and Deceptive Trade Practices Act).

To survive summary judgment on the issue of proximate causation, a plaintiff's evidence must establish that the defendant's conduct caused the injury by a "'probability' rather than mere 'possibility,' precisely to guard against raw speculation." *Sakaria v. Trans World Airlines*, 8 F.3d 164, 172–73 (4th Cir. 1993) (citations omitted); *see also RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 199 (4th Cir. 2016) (observing that evidence under Trade Secrets Act must be "sufficient to justify . . . an inference of the fact in question" (citations and internal quotation marks omitted)). Accordingly, to withstand

8

summary judgment, the non-moving party must set forth evidence of causation that is "fact-specific," rather than speculative. *See Ross v. FDIC*, 625 F.3d 808, 817 (4th Cir. 2010) (applying proximate cause standard to a claim under North Carolina Unfair and Deceptive Trade Practices Act). And, when there are multiple possible causes of an injury, a plaintiff must show that the defendant's conduct was a "substantial factor" in causing the injury. *Id.*

In our analysis here, we will assume without deciding that Mortgage Group's information constituted trade secrets and that Glenn shared some of those trade secrets with Stonegate. We conclude nevertheless that the district court properly granted summary judgment to Stonegate, because Mortgage Group failed to produce evidence that Glenn's transfer of the alleged trade secrets to Stonegate was a proximate cause of Mortgage Group's loss of revenue in North Carolina.

In support of its theory of proximate causation, Mortgage Group relies on two financial reports prepared by WeissMalik.[5] In the first report, WeissMalik compared Mortgage Group's loan sales for its accounts assigned to Glenn with Mortgage Group's national loan sales, in an attempt to determine economic losses that Mortgage Group sustained as a result of Glenn's departure. WeissMalik calculated that both the sales from

---

[5] Mortgage Group also contends that certain circumstantial evidence can support a finding of causation. For example, Glenn and a manager at Stonegate visited North Carolina mortgage brokers at an industry event just before Glenn joined Stonegate, and Glenn told one broker who was not a client of Mortgage Group or Stonegate that she was "at [Mortgage Group] and [she] was considering moving over to Stonegate." This evidence, however, has no bearing on whether Stonegate's alleged misappropriation of customer information caused damages to Mortgage Group.

Glenn's accounts and from Mortgage Group's nationwide portfolio declined at the same rate in late 2011 while Glenn still was employed by Mortgage Group. WeissMalik additionally observed that Mortgage Group's national sales rebounded in 2012, while sales from Glenn's former accounts in North Carolina did not. Thus, WeissMalik concluded that Glenn's resignation caused Mortgage Group to suffer lost revenues in North Carolina.

We hold that WeissMalik's conclusions were speculative and failed to support a finding of proximate causation. Primarily, the report failed to support the proposition that Mortgage Group's decline in sales in North Carolina was related to the misappropriation of Mortgage Group's customer information, rather than resulting from Glenn's resignation or from any other event. WeissMalik's report simply set forth a correlation between the timing of Glenn's resignation and a continued decline in Mortgage Group's North Carolina sales, without any evidence showing that the misappropriation caused that decline. Additionally, WeissMalik's conclusion "assumed that North Carolina [loan] numbers can be reliably and accurately compared with [Mortgage Group's] nationwide data," an assumption that provided the foundation for his report. Thus, despite the correlation between the timing of the alleged misappropriation and Mortgage Group's decline in revenue in North Carolina, WeissMalik failed in his first report to show a causal connection between the two occurrences.

In his second report, WeissMalik attempted to calculate "the benefit [Stonegate] received" from the alleged misappropriation, based on Stonegate's putative profits from Glenn's accounts at Stonegate. WeissMalik posited that Stonegate's profit on loans Glenn brought to the company could be calculated from public filings of Stonegate's average

10

revenues and expenses per loan. WeissMalik relied on those filings to project a profit from each loan attributable to Glenn's customers, and arrived at a total profit of over $7 million that Stonegate received from customers Glenn brought to Stonegate.

Like his first report, WeissMalik's second report is speculative and fails to support a finding of proximate causation. WeissMalik did not provide any evidence in that report of a causal connection between Stonegate's misappropriation of customer information and any profits gained by Stonegate. Mortgage Group's counsel even admitted at oral argument that Mortgage Group failed to proffer any evidence that Stonegate's revenue increased due to the misappropriation. Also, WeissMalik never identified any actual profits made by Stonegate on particular loans. Instead, he assumed both that the public filings of aggregate financial information could accurately establish profits made on individual loans, and that Glenn's customer accounts at Stonegate were the same accounts that she oversaw at Mortgage Group, despite Glenn's testimony that her work at Stonegate involved "a totally different . . . customer base."

We further observe that Stonegate presented substantial evidence of other causes for the decline in Mortgage Group's North Carolina business. *See generally Charlottesville Music Ctr., Inc. v. Magnepan, Inc.*, 655 F.2d 38, 40–41 (4th Cir. 1981) (holding that an executive's testimony that business experienced sales decrease because of illegal activity did not establish proximate causation to prove tortious interference under Virginia law, when evidence showed that other factors "directly contributed to the sales decline"). Mortgage Group's national loan sales began to decline substantially in late 2011. And, as noted above, North Carolina brokers who had been Glenn's clients at Mortgage Group

testified that its North Carolina business declined because of funding problems, customer complaints, and Mortgage Group's failure to employ an account executive resident in North Carolina. Given this evidence of other causes, Mortgage Group failed to show that Stonegate's alleged misappropriation was a "substantial factor" in causing Mortgage Group to sustain losses in revenue. *Ross*, 625 F.3d at 817.

In view of the entire record, we hold that the district court did not err in concluding that the causation evidence presented by Mortgage Group was insufficient as a matter of law. WeissMalik's two reports failed to demonstrate a causal connection between Mortgage Group's decreased financial earnings in North Carolina and the customer information that Glenn provided to Stonegate. Instead, WeissMalik merely offered his opinion that Glenn's change in employment generally caused damages to Mortgage Group. And Mortgage Group has not provided any other evidence that Stonegate's acquisition or use of the customer information was a proximate cause of damages to Mortgage Group.[6] *See* N.C. Gen. Stat. § 66-154(b) (stating that damages must be "caused by misappropriation").

---

[6] We also observe that Mortgage Group's reliance on *Sulzer Carbomedics, Inc. v. Oregon Cardio-Devices, Inc.*, 257 F.3d 449 (5th Cir. 2001), is misplaced. *Sulzer* involved allegations of breach of an employee's non-compete agreement, not misappropriation of trade secrets. *Id.* at 451, 457–59 (applying Oregon law). The former employer in that case also claimed that its damages were caused by the new employer's tortious interference with contract, namely, its "inducement" of the employee to leave the former employer. *Id.* at 453, 458. The evidence in the present case, however, does not support an analogous causal link between misappropriation and damages, because Glenn's resignation from Mortgage Group is distinct from the allegations of misappropriation.

Accordingly, we hold that Mortgage Group has not supplied the necessary "fact-specific" evidence establishing a causal connection between the alleged misappropriation and any damages sustained by Mortgage Group. *Ross*, 625 F.3d at 817; *Sakaria*, 8 F.3d at 172–73. The district court therefore properly granted summary judgment in favor of Stonegate.

III.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*